**UNITED STATES of America, Plaintiff,**

v.

**COMMONWEALTH OF VIRGINIA, et al., Defendants.**

**Civ. A. No. 90–0126–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

June 14, 1991.

Dick Thornburgh, Atty. Gen., James P. Turner, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., E. Montgomery Tucker, Asst. U.S. Atty., John P. Alderman, U.S. Atty., Roanoke, Va., Nathaniel Douglas, John R. Moore, D. Judith Keith, U.S. Dept. of Justice, Civil Rights Div., Educational, Opportunities Litigation Section, Washington, D.C., for plaintiff.

Walter A. McFarlane, Office of the Governor, Richmond, Va., Benjamin R. Civiletti, John H. Lewin, Jr., James A. Dunbar, Vanable, Baetjer & Howar, Baltimore, Md., for Lawrence Douglas Wilder, Governor.

B. Powell Harrison, Jr., Robert H. Spilman, Samuel E. Woolwine, James W. Enochs, Jr., William A. Hazel, Harvey S. Sadow, Douglas K. Baumgartner, Daniel D. Cameron, Glen N. Jones, John W. Roberts, Members of the Bd. of Visitors of Virginia Military Institute, Gordon K. Davies, Director of the Virginia State Council of Higher Educ. and The Virginia State Council of Higher Educ. and its Members and Officers.

Griffin B. Bell, William A. Clineburg, Jr., King & Spalding, Atlanta, Ga., Robert H. Patterson, Jr., William G. Broaddus, Anne Marie Whittemore, J. William Boland, McGuire, Woods, Battle & Boothe, Richmond, Va., William B. Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., for Virginia Military Institute, its Superintendent and its Bd. of Visitors.

James A.L. Daniel, Daniel, Vaughan, Medley & Smitherman, Danville, Va., Joel

I. Klein, Onek, Klein & Farr, Washington, D.C., pro hac vice, for Com. of Va.

## MEMORANDUM OPINION [1]

KISER, District Judge.

*The Controversy*

It was in May of 1864 that the United States and the Virginia Military Institute (VMI) first confronted each other. That was a life-and-death engagement that occurred on the battlefield at New Market, Virginia. The combatants have again confronted each other, but this time the venue is in this court. Nonetheless, VMI claims the struggle is nothing short of a life-and-death confrontation—albeit figurative.

The conflict between the parties arises out of the United States' challenge to VMI's all-male admissions policy. The United States asserts that as a state-supported college, VMI's refusal to admit females to the Institute, regardless of their qualifications, violates the Equal Protection Clause of the Fourteenth Amendment. VMI counters by saying that although it discriminates against women, the discrimination is not invidious but rather to promote a legitimate state interest—diversity in education. Thus, the issue to be resolved is whether VMI's practice of excluding women can pass muster under the equal protection clause, as glossed by the decisions of the Supreme Court. I find that it can, for the reasons that I hereafter state.

*Jurisdiction*

This Court's jurisdiction was properly invoked under Title IV of the Civil Rights Act, 42 U.S.C. § 2000c–6, which permits the United States to bring actions alleging discrimination in violation of either the United States Constitution or other federal statutes.

Because single-sex colleges and single-sex military schools are exempted from Title IX of the Civil Rights Act, 20 U.S.C. 1681(a)(4) and (5), the United States alleged only a constitutional violation and no statutory violation. The Department of Jus-

tice's authority to bring a suit under Title IV is not limited by Title IX. *United States v. Massachusetts Maritime Academy,* 762 F.2d 142, 147–51 (1st Cir.1985). Of course, although Congress could deprive the Attorney General of the authority to bring this action, it could not pass a statute that would exempt VMI's alleged equal protection violations from judicial review. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 733, 102 S.Ct. 3331, 3340, 73 L.Ed.2d 1090 (1982).

*Procedural Background*

This case originated from a complaint filed by the United States Department of Justice on behalf of a female high school student who wanted to be considered for admission to VMI. The named defendants were the Commonwealth of Virginia; Governor Lawrence Douglas Wilder; Virginia Military Institute, its president, superintendent, and members of its Board of Visitors; and Virginia's State Council of Higher Education and its members. The State Council of Higher Education and its members have been dismissed from the suit. The Commonwealth has been granted a stay relieving it of the duty to appear at trial, under the condition that it be bound by any ruling of this Court. Governor Wilder was relieved of the duty to respond to any subpoenas requiring him to testify at trial. In response to an earlier motion, he stated that he did not oppose entry of summary judgment against himself and the other defendants. The VMI Foundation and the VMI Alumni Association, private organizations associated with VMI, have intervened as defendants in the case over the United States' objection. *See* ruling of November 27, 1990.

A six-day trial was held beginning April 4, 1991. Nineteen witnesses testified, including four experts on education, one expert on college facilities, and one expert on human physiology. All defendants, except Governor Wilder, were represented by common counsel. Governor Wilder was represented by counsel, but he did not personally appear or participate in the trial.

---

1. Detailed findings of fact are set forth in the Appendix to this Memorandum Opinion, por-

tions of which will be referred to throughout the Opinion.

*Standard of Review*

█ The VMI Board of Visitors decides the admissions policy of VMI. The seventeen members of this Board are appointed by the Governor of Virginia, subject to approval by the General Assembly, including the State Adjutant General, who is a member *ex officio.* Va.Code § 23–93; Va. Code § 44–11 (Adjutant General also nominated by Governor subject to General Assembly approval). Twelve of the members must be VMI alumni.

All parties recognize that this case concerns educational policy, and the proper standard of review should be derived from cases concerning higher education. The principle of academic freedom, an aspect of the freedom of association guaranteed by the First Amendment, has been recognized by the Supreme Court as a reason to defer to academic decisionmaking by a university. *Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978).[2] The essential freedoms of a university include the freedom to choose who may be admitted to study. *Id.* (Quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Justice Frankfurter concurring)). "[A]ttainment of a diverse student body ... is a constitutionally permissible goal for an institution of higher education." *Id.* While *Bakke* involved diversity within a single graduate program[3], other courts have extended the rationale of that decision to include the freedom to create different missions at different state universities, in order to promote diverse educational opportunities within the state. *Williams v. McNair,* 316 F.Supp. 134, 137 (D.S.C.1970) (three-judge panel), *aff'd,* 401 U.S. 951, 91 S.Ct. 976, 28 L.Ed. 235 (1971) (per curiam); *Ayers v. Allain,* 914 F.2d 676, 687 (5th Cir.1990 *en banc*), *cert. granted sub nom. United*

*States v. Mabus,* —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991).

However, deference to university decisions is not absolute. The Supreme Court ordered racial integration of graduate programs long before it ordered desegregation of lower public schools. *Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); *Sipuel v. Board of Regents,* 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); *McLaurin v. Oklahoma State Regents,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). Courts have, in some cases, entered injunctions that have the effect of overruling discretionary educational decisions of individual colleges, where those decisions tend to perpetuate unconstitutional discrimination. In *Norris v. State Council of Higher Education,* 327 F.Supp. 1368 (4th Cir.), *aff'd,* 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971), a three-judge panel of the Fourth Circuit entered an injunction preventing Richard Bland College, a two-year branch of the College of William and Mary, from expanding into a four-year college, because that would have impeded desegregation of nearby Virginia State College.

*Sex Discrimination*

The first court challenge to sex segregation in Virginia higher education appeared in *Kirstein v. Rector and Visitors of the University of Virginia,* 309 F.Supp. 184 (E.D.Va.1970) (three-judge panel) (approving consent order). In that case, the court found that "we think it fair to say from the evidence that the most prestigious institution of higher education in Virginia is the University of Virginia in Charlottesville." *Id.* at 186. The court was reluctant to "interfere with the internal operation of any Virginia college or university," but it encouraged a settlement that required the

---

2. However, this is not the same degree of deference as is accorded Congress in matters of national defense. *See Rostker v. Goldberg,* 453 U.S. 57, 64–67, 101 S.Ct. 2646, 2651–53, 69 L.Ed.2d 478 (1981).

3. In *Bakke,* the University of California attained racial diversity by reserving a number of open-

ings in its medical school for minorities. Because of that quota system, Bakke was denied admission. It seems to me that a policy which denies admission based on a quota system does not differ in principle, but only in degree of restrictiveness, from a policy which totally restricts admission of an identifiable class.

university to admit women. But the court refused to enter an order requiring Virginia to admit both sexes to all of its universities:

> We are urged to go further and to hold that Virginia may not operate any educational institution separated according to the sexes. We decline to do so. Obvious problems beyond our capacity to decide on this record readily occur. One of Virginia's educational institutions is military in character. Are women to be admitted on an equal basis, and, if so, are they to wear uniforms and be taught to bear arms?

*Id.* at 187.

Another early Fourth Circuit decision, affirmed by the Supreme Court, involved Winthrop College in Rock Hill, South Carolina. *Williams v. McNair, supra.* In that case, male students wanted to attend an all-female college. The Court noted that South Carolina had one public all-male college (The Citadel, which like VMI offers a military program), and several coeducational institutions. The court noted,

> It is conceded that recognized pedagogical opinion is divided on the wisdom of maintaining "single-sex" institutions of higher education but it is stipulated that there is a respectable body of educators who believe that "a single-sex institution can advance the quality and effectiveness of its instruction by concentrating upon areas of primary interest to only one sex."

316 F.Supp. at 137. Unlike *Kirstein*, there was no feature of Winthrop College other than its single-sex status that made it distinctive, and the plaintiffs' interest in attending college in the town where they lived was found to be less than compelling. The denial of admission to them was not an equal protection violation.[4]

*Hogan, supra,* guides my decision in this case. In *Hogan*, the Supreme Court conducted a factual inquiry into the justification for the policy of the Mississippi University for Women of allowing men to audit courses in the nursing program, but not granting them academic credit. It concluded that the policy denied equal protection to the plaintiff, who wished to earn credit for advanced nursing courses at the school.

The *Hogan* court applied the "intermediate scrutiny" test:

> [T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification. The burden is met only by showing at least that the discrimination serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.

*Hogan,* 458 U.S. at 730, 102 S.Ct. at 3339 (citations and punctuation omitted).[5]

Where a state offers an educational opportunity to only one gender,

> The issue is not whether the benefitted class profits from the classification, but whether the State's decision to confer a benefit only upon one class by means of a discriminatory classification is substantially related to achieving a legitimate and substantial goal.

*Id.* at 731 n. 17, 102 S.Ct. at 3340 n. 17. Finally,

> [a]lthough the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions. Thus, if the statutory objective is to exclude or

---

**4.** This reasoning was adopted by Justice Powell in dissent in *Hogan,* 458 U.S. at 736, 102 S.Ct. at 3342 ("There is, of course, no constitutional right to attend a state-supported university in one's home town").

**5.** This is the "intermediate judicial scrutiny" test, now universally employed in sex discrimi-

nation cases based on the equal protection clause. The test originated in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and so had not been applied in *Kirstein* or *Williams.* G. Gunther, *Constitutional Law* 647 n. 3 (11th ed. 1985).

"protect" members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate.

*Id.* at 724–25, 102 S.Ct. at 3336.

*Hogan* involved admission of a single student into the nursing school, and the Court did not purport to extend its ruling to cover other programs at the school. *Id.* 458 U.S. at 733, 102 S.Ct. at 3340 (Chief Justice Burger dissenting). These determinations require a fact-intensive examination of the practical considerations underlying the challenged policy.

Many of the facts underlying the Supreme Court's rejection of the justification proferred in *Hogan* are not present here. In *Hogan*, Justice O'Connor's majority opinion emphasized that the

> uncontroverted record reveals that admitting men to nursing classes does not affect teaching style, ... that the presence of men in the classroom would not affect the performance of the female nursing students, ... and that men in coeducational nursing schools do not dominate the classroom.... In sum, the record in this case is flatly inconsistent with the claim that excluding men from the School of Nursing is necessary to reach any of MUW's educational goals.

*Hogan*, 458 U.S. at 731, 102 S.Ct. at 3339.[6] The record in this case is directly to the contrary. The record is replete with testimony that single gender education at the undergraduate level is beneficial to both males and females. Moreover, the evidence establishes that key elements of the adversative VMI educational system, with its focus on barracks life, would be fundamentally altered, and the distinctive ends of the system would be thwarted, if VMI were forced to admit females and to make changes necessary to accommodate their needs and interests.

One of the most striking differences in the two cases is the reasons proffered to justify the discrimination. In *Hogan*, Mis-

sissippi maintained that a female-only admission policy at MUW was affirmative action which was justified to compensate women for past discrimination whereas, here, Virginia urges that a male-only admission policy at VMI promotes diversity within its statewide system of higher education. The Court found that Mississippi's proffered explanation failed both prongs of the intermediate scrutiny test, i.e., that it was not an important governmental objective and that the means of advancing the objective were not substantially related to the achievement of that objective. In contrast, diversity in education has been recognized both judicially and by education experts as being a legitimate objective. The sole way to attain single-gender diversity is to maintain a policy of admitting only one gender to an institution.

I also note that the plaintiff in *Hogan* was a resident of the town where Mississippi University for Women was located. He would have had no opportunity to study his chosen profession (nursing) within commuting distance of his home if he could not attend that school, and moving to a different community would have presented him with a significant hardship. *Id.* 458 U.S. at 735 n. 1, 102 S.Ct. at 3342 n. 1 (Justice Powell dissenting). VMI does not offer an advantage of close-to-home education to any students, male or female, because it requires all cadets to live on campus for all four years of college. Finding III.F.1. The night and Summer courses, which do serve commuting students, are open to both men and women. Findings I & III. Nor does its policy deny the opportunity to study any particular academic program to anyone, because all of the same courses, including military instruction, are available at VPI. Finding III.H.2.

*Single-sex Education is a Constitutionally Legitimate Form of Diversity*

■ A substantial body of "exceedingly persuasive" evidence supports VMI's contention that some students, both male and female, benefit from attending a single-sex

---

**6.** The procedural posture of *Hogan* at the Supreme Court may explain why the evidence was uncontroverted. Mississippi University for

Women won at the district court level on summary judgment.

college. Finding VII.B. For those students, the opportunity to attend a single-sex college is a valuable one, likely to lead to better academic and professional achievement. Finding VII.B.10. Astin, *Four Critical Years* (1977). Most importantly, Dr. Conrad, the United States' expert witness on higher education, called himself a "believer in single-sex education." Finding VII.B.7. He believed that single-sex education should be provided only by the private sector, because he also believes that public institutions should be open to all citizens to the extent possible. He concedes that his public/private dichotomy is a personal, philosophical preference rather than one born of educational-benefit considerations. An opinion based on equity rather than appropriate educational methods is entitled to little weight. Finding VII.B.7.[7] *Rostker*, 453 U.S. at 79–81, 101 S.Ct. at 2659–60.

One empirical study in evidence, not questioned by any expert, demonstrates that single-sex colleges provide better educational experiences than coeducational institutions. Students of both sexes become more academically involved, interact with faculty frequently, show larger increases in intellectual self-esteem and are more satisfied with practically all aspects of college experience (the sole exception is social life) compared with their counterparts in coeducational institutions. Attendance at an all-male college substantially increases the likelihood that a student will carry out career plans in law, business and college teaching, and also has a substantial positive effect on starting salaries in business. Women's colleges increase the chances that those who attend will obtain positions of leadership, complete the baccalaureate degree, and aspire to higher degrees. Alexander Astin, *Four Critical Years*, (1977); VMI Ex. 73I; Finding VII.B.10. This research was cited favorably by Justice Powell in his dissenting opinion in *Hogan*, 458 U.S. at 738–39, 102 S.Ct. at 3343–44. Viewed in the light of this very substantial

authority favoring single-sex education, the VMI Board's decision to maintain an all-male institution is fully justified even without taking into consideration the other unique features of VMI's method of teaching and training.

Openness and equal treatment by public institutions is a valid legislative goal, but legislators or other decisionmakers may also take other goals into account, even when adopting a policy that discriminates on the basis of sex. *Id.* The VMI Board has decided that providing a distinctive, single-sex educational opportunity is more important than providing an education equally available to all.

*Effect of Coeducation at VMI*

When one considers VMI's methods of education and the effect that admission of women into the institution will have, the Board's decision to remain an all-male institution is further reinforced. Expert testimony established that, even though some women are capable of all of the individual activities required of VMI cadets, a college where women are present would be significantly different from one where only men are present. This is true for a variety of reasons discussed more fully in the Findings of Fact. *See* Findings VIII.D–J. In addition to converting VMI from a single-gender institution to a coeducational institution, changes in methods of instruction and living conditions would occur.

As West Point's experience in converting to coeducation bears out, the presence of women would tend to distract male students from their studies. It would also increase pressures relating to dating, which would tend to impair the *esprit de corps* and the egalitarian atmosphere which are critical elements of the VMI experience. Finding VIII.H.

Allowance for personal privacy would have to be made. Doors would have to be locked, and the windows on all of the doors would have to be covered. This would alter the adversative environment that VMI

---

**7.** VMI, like all of the colleges in Virginia, also has academic requirements for admission, including high school graduation, class rank, and Scholastic Aptitude Test performance, that ef- fectively exclude many male candidates from the college. This kind of limitation on access apparently did not trouble Dr. Conrad.

students must now endure. Finding VIII.D.

Physical education requirements would have to be altered, at least for the women. The current program, where every student must pass precisely the same physical test before graduation, would prevent a disproportionate number of women from graduating, thus forcing VMI either to establish different requirements for women, or to eliminate or substantially reduce the requirements so that they could be applied to both sexes, which would remove one important part of the VMI system of education. Finding VIII.E–G.

The introduction of women into VMI would add a new set of stresses on the cadets, of a very different kind than the cadets now face. The belief that this would affect the educational program is well-founded in empirical evidence, and not based on an archaic stereotype. Finding VIII.1; *Williams, supra; Vorchheimer v. School Dist. of Philadelphia,* 532 F.2d 880, 882 (3d Cir.1976), *aff'd by an equally divided court,* 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 750 (1977); *see also* Justice Powell's dissenting opinion in *Hogan,* 458 U.S. at 735–46, 102 S.Ct. at 3341–47.

Dr. Riesman testified that the adversative model of education is simply inappropriate for the vast majority of women. He felt that if VMI were to admit women, it would eventually find it necessary to drop the adversative system altogether, and adopt a system that provides more nurturing and support for the students. Evidence supports this theory, including the West Point experience.[8] Dr. Conrad argued that some women will thrive in the adversative environment, and drastic changes in that aspect of the education will not be necessary. But as Dr. Richardson pointed out, educational systems are not designed for the exception but for the mean. Finding VII.B.1. The changes, which all parties agreed would occur, provide sufficient constitutional justification for continuing the single-sex policy.

The United States has asserted that VMI's decision to continue its single-sex policy in 1986, based on the report of its advisory committee, was not based on "reasoned analysis" or on the evidence before it. It is clear that the Committee met with some advocates of coeducation, and that it rejected their recommendations. However, the committee members also had considerable experience in higher education, as well as intimate knowledge of the VMI program.[9] The more thorough self-study undertaken by VMI as part of its accreditation by the Southern Association of Colleges and Schools demonstrates that VMI has applied reasoned analysis to all of its policies, including admissions. The Board of Visitors had available to it a substantial amount of "reasoned analysis" when it considered admissions policy.

I find that both VMI's single-sex status and its distinctive educational method represent legitimate contributions to diversity in the Virginia higher education system, and that excluding women is substantially related to this mission. The single-sex status would be lost, and some aspects of the distinctive method would be altered if it were to admit women. VMI has, therefore, met its burden under *Hogan* of showing a substantial relationship between the single-sex admission policy and achievement of the Commonwealth's objective of educational diversity.

*Of What are Women Deprived*

Trial testimony established that VMI's military program is absolutely unique. No

---

**8.** The United States urges that the success at West Point in assimilating women into the institution is proof that VMI could do likewise. Without a doubt, VMI could do likewise, but it is equally without a doubt that VMI's present methods of training and education would have to be changed as West Point's were.

**9.** Although *Hogan* requires that a state policy of sex discrimination be based on a "reasoned analysis," it does not suggest how a court should review the analysis. 458 U.S. at 726, 102 S.Ct. at

3337. I understand *Hogan* to require me to consider the constitutionality of VMI's policy *de novo,* according only such weight to the state's analysis as appears appropriate. However, I am not to substitute my judgment for that of the Board of Visitors as if I were the *primary* decisionmaker. *Rostker,* 453 U.S. at 70, 101 S.Ct. at 2654. My conclusions are based on evidence submitted at trial, and are not limited to the 1986 Mission Study Report.

other school in Virginia or in the United States, public or private, offers the same kind of rigorous military training as is available at VMI. The military and academic courses are available to women at VPI, but without the intensity of the barracks-centered lifestyle that makes VMI so attractive to many applicants, and so important to its graduates. Finding V.17.

It has been established that if VMI were to admit women, it would become more similar to the military barracks at VPI, so its uniqueness would be lost. Even if this were to occur, VMI would remain the only small college campus in Virginia offering a military program. A woman who wished to live in a military barracks, but preferred a campus of 1,300 students over one of 18,000, would benefit from the availability of VMI.

Considerable speculation, but very little evidence, was presented on the question of whether there would be any demand for a VMI education among women. Because VMI and VMI alumni direct their recruitment efforts only at men, it cannot be precisely determined how much demand there might be among women. Based on the experience at West Point, as well as VMI's experience recruiting black applicants, I conclude that some women, at least, would want to attend the school if they had the opportunity. *Hogan* seems to teach that the court must consider the constitutionality of the policy without regard to the size of the available applicant pool. The Department of Justice filed this suit on behalf of a potential applicant, and that is all that is required to test the constitutionality of VMI's admissions policy.

*Absence of Comparable Opportunity for Women*

Ironically, although much of the testimony at trial concerned the ways that men and women are different, my ruling is based on a trait that men and women share: Both men and women can benefit from a single-sex education. Indeed, it ap-

pears that demand for single-sex education is greater among women, and that the beneficial effects of single-sex education are stronger among women than among men. Finding II.B.3–4.

Gender discrimination, as a rule, works to the benefit of one group and to the detriment of another. But in a real sense of the word, that is not true in this case because, as the testimony of experts demonstrates, it would be impossible for a female to participate in the "VMI experience." Even if the female could physically and psychologically undergo the rigors of the life of a male cadet, her introduction into the process would change it. Thus, the very experience she sought would no longer be available. Consequently, it seems to me that the criticism which might be directed toward Virginia's higher educational policy is not that it maintains VMI as an all-male institution, but rather that it fails to maintain at least one all-female institution.[10] But this issue is not before the Court.

The relief that the United States seeks in this suit is to require VMI to open its doors to women—not to force Virginia to establish an all-female, state-supported college. *Cf. Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (federal court could not exercise jurisdiction over school districts that had not practiced unconstitutional racial segregation in order to achieve racial balance in another school district). This aspect of the case is very similar to *Hogan* in that Hogan did not mount a constitutional challenge because there was no corresponding all-male counterpart to the MUW Nursing School but only sought admission to the MUW program. The Court was careful to tailor its decision to the relief sought. Thus, whether Virginia can continue to rely upon private colleges to supply single-gender education to females or whether it must oper-

---

10. This situation is *not* the result of a long-standing discriminatory policy, but a recent development. In 1839, the same legislative session that founded VMI also incorporated the Farmville Female Seminary Association. The

Farmville Female Seminary was made a public institution in 1884. Finding II.2. In addition, Mary Washington, Radford and Madison Colleges were state-supported, all-female colleges until the late 1960's.

ate a state-supported, all-female college is not an issue to be resolved in this lawsuit.

*Conclusion*

In 1970, a three-judge panel of the Fourth Circuit observed that:

The trend in this country is away from the operation of separate institutions for the sexes, but there is still a substantial number of private and public institutions, which limit their enrollment to one sex and do so because they feel it offers better educational advantages. While history and tradition alone may not support a discrimination, the Constitution does not require that a classification "keep abreast of the latest" in educational opinion, expecially when there remains a respectable opinion to the contrary[.]

*Williams,* 316 F.Supp. at 137.

Through its Board of Visitors at VMI, Virginia has set an objective of providing single-gender education for males. The evidence in the case, which is virtually uncontradicted, supports Virginia's view that substantial educational benefits flow from a single-gender environment, be it male or female, that cannot be replicated in a coeducational setting. This adds a measure of diversity to Virginia's overall system of education that would be missing if VMI were coeducational. The diversity is further enhanced by VMI's unique method of instruction which was applauded by all of the educational experts who testified. Thus, Virginia has sustained the requirement that gender discrimination serves an important state educational objective.

Virginia also met the second prong of the *Hogan* test by proving that the objective of diversity of education is met by providing single-gender education. Obviously, the only means of attaining this goal is to exclude women from the all-male institution—VMI. But Virginia did not stop there. It enlarged on the single-gender diversity by maintaining an institution whose method of instruction is unique in all the world.

VMI is a different type of institution. It has set its eye on the goal of citizen-solider and never veered from the path it has chosen to meet that goal. VMI truly marches to the beat of a different drummer, and I will permit it to continue to do so.

## APPENDIX: FINDINGS OF FACT

I. Witnesses
 A. Expert Witnesses
 B. Fact Witnesses

II. Public Higher Education in Virginia
 A. VMI's Contribution to System–Wide Diversity
 B. Role of Private Colleges
 C. Public Influence on Private Colleges

III. The Unique VMI Educational Method
 A. The Adversative Model
 B. Rat line
 C. Class System
 D. Dyke System
 E. Honor Code
 F. Barracks
 G. Military System
 H. Educational System
 I. Evening and Summer Sessions

IV. VMI's Mission
 A. Character Development
 B. Civilian Leadership
 C. Military Leadership
 D. VMI Mission Study

V. Mission of Military Unit at VPI

VI. Contrasting Mission of Federal Service Academies

VII. Differences between Men and Women
 A. Gender–Based Physiological Differences
 B. Gender–Based Developmental Differences

VIII. Anticipated Effects of Coeducation on VMI

A. Demand for VMI Education Among Women

B. VMI's Special Recruitment of Blacks

C. Recruitment of Women at Other Military Institutions

D. Need for Privacy

E. Physical Education

F. Armed Forces Experience

G. West Point Experience

H. Impact of Gender Classes

I. Impact of Cross–Sex Relationships

J. West Point Experience

K. Educational and Military Systems

L. ROTC Programs

M. Physical Facilities

### I. *Witnesses*

Testimony of the following witnesses, together with stipulations and exhibits supplied the evidence from which these Findings of Fact are made:

### A. *Expert Witnesses*

1. Dr. Clifton Conrad testified as the United States' expert witness on education. He is currently Professor of Higher Education and Coordinator of the doctoral program in Higher Education at the University of Wisconsin–Madison, and previously had been on the faculties of the University of Denver, the College of William and Mary, and the University of Arizona. He holds a Bachelor's Degree from the University of Kansas and a Ph.D. in higher education from the University of Michigan. His scholarship has focused on academic programs in higher education. His books and monographs include *The Undergraduate Curriculum* (1978), *Liberal Education in Transition* (1980, with Jean Wyer), and *Curriculum in Transition: Perspectives on the Undergraduate Experience* (1990, with Jennifer Haworth). In 1987–88, he served as president of the Association for the Study of Higher Education. He has testified in several other desegregation cases involving higher education on behalf of the United States. U.S. Ex. 160.

2. Mr. James Francis Brewer, III testified as the United States' expert witness on physical facilities. He has been Director of Physical Plant at the University of Maryland at College Park since 1985. He holds B.S. and M.B.A. degrees from the University of Maryland. U.S. Ex. 161.

3. Dr. Richard C. Richardson, Jr. testified as one of VMI's experts on educational institutions. He is Professor of Educational Leadership and Policy Studies at Arizona State University. He holds a B.S. degree in education from Castleton State College, an M.A. from Michigan State University, and a Ph.D. from the University of Texas. After earning his Bachelor's Degree, he served in the Marine Corps for three years, from 1954 to 1957. He taught at a single-sex (women's) college, Vermont College, from 1958 to 1961, and has both professorial and administrative experience at several colleges and community colleges. His publications include *Achieving Quality and Diversity: Universities in a Multicultural Society* (with E.F. Skinner, 1991), and *Fostering Minority Access and Achievement in Higher Education: The Role of Urban Community Colleges and Universities* (with L.W. Bender, 1987). He has previously testified on behalf of the United States in discrimination lawsuits involving higher education. He has served as chair of at least 25 different evaluation teams on behalf of regional higher education accreditation boards, including one team that evaluated West Point. His research in the past 10 years has focused on "the impact of students on colleges and the impact of colleges on students." Tr. 661–66.

4. Dr. David Riesman, a professor of sociology at Harvard University, testified as a VMI expert on education. He holds a bachelor's degree from Harvard College earned in 1931, and a law degree from Harvard Law School earned in 1934. After completing a year of postgraduate study, he served as a law clerk to Justice Brandeis at the United States Supreme Court. He held a teaching post at Buffalo School, and

then spent a year as a research fellow at Columbia Law School studying sociology and anthropology. He joined the faculty at the University of Chicago in 1946, and returned to Harvard on the faculty in 1958. His publications include *The Lonely Crowd* (1950), *Constraint and Variety in American Education* (1956), *The Academic Revolution* (with Christopher Jencks 1968), and *On Higher Education: The Academic Enterprise in an Era of Rising Student Consumerism* (with several collaborators 1980). Because he was unable to travel, he appeared only on videotape produced at a *de bene esse* deposition.

5. Josiah Bunting, III, testified as another VMI expert on educational institutions. Since 1987, he has served as Head Master of The Lawrenceville School, a private preparatory school in New Jersey that changed from all-male to coeducational during his tenure. He graduated from VMI in 1963, and won a Rhodes Scholarship and earned an M.A. at Oxford. He served in the United States Army from 1966 to 1972, serving in the infantry, and as Assistant Professor at West Point. From 1972 to 1973 he was Professor and Acting Head of the U.S. Naval War College. From 1973 to 1977, he served as President of Briarcliff College, then an all-female college. From 1977 to 1987, he was president of Hampden–Sydney College, an all-male private college.

6. Dr. Paul Davis testified as VMI's expert on human physiology. He holds a bachelor's degree from Columbia Union College, and earned a master's degree in physical education from the University of Maryland, and a Ph.D. from the University of Maryland College of Health and Human Performance, Department of Kinesiology, with a major in exercise physiology and a minor in research design and statistics. He has taught physical education to both sexes at the elementary school, junior high school and high school levels, and taught applied physiology at the University of Maryland. He has done extensive consulting for the United States Armed Forces on the development of physical training programs for both men and women. Tr. 879–84.

### B. *Fact Witnesses*

1. General John William Knapp is the Superintendent of VMI. He graduated from VMI in 1954, holds a Ph.D. from Johns Hopkins University, and has been a professor or administrator at VMI since 1959. He was Dean of Faculty from 1984 to 1989, when he was promoted to superintendent. Tr. 28–30.

2. Colonel Norman M. Bissell is the Commandant of Cadets at VMI, a position comparable to Dean of Students at another college. He graduated from VMI in 1961, and received a master's degree from the University of Missouri in 1984. He was on active duty in the United States Army from 1961 to 1987, and returned to VMI in 1990. Tr. 95–96.

3. Lieutenant Colonel Mark Steven Sandy is the director of admissions at VMI. He holds a B.S. from Concord College, and has a master's degree in education administration from Lynchburg College. He assumed his current post in 1988.

4. Colonel Ronald Walker Williams is Professor of Aerospace Studies at VMI. He graduated from VMI in 1964 and earned a master's degree from Golden Gate University in 1985. He has been on active duty with the Air Force for the past 25 years, and has been posted at VMI by the Air Force for a three year assignment in 1988. He teaches the Air Force ROTC courses at VMI. Tr. 213–14.

5. Colonel William A. Randall is a professor of military science at the University of Virginia, where he is completing a three-year assignment. He holds a B.A. degree from Auburn University and a master's degree from Duke University. He has been on active duty in the military since 1966. Tr. 243–44.

6. Colonel Rutherford Dean Stickell is Professor of Aerospace Studies and Chairman of the Air Force ROTC program at the University of Virginia. He holds a bachelor's degree from The Citadel, and a master's degree from the University of South-

ern California, and has been in the military for over 20 years.

7. Joseph M. Spivey, III, is Chairman of the Board of Visitors of VMI. He holds a bachelor's degree from VMI and a law degree from Washington & Lee University. He was admitted to the Virginia bar in 1962, and is a practicing attorney. He was appointed to the VMI Board of Visitors in 1983 and has been chairman since 1987. Tr. 275–76.

8. Dr. Clark King is the head of the Physical Education Department at VMI, and director of the continuing education programs, including both the night and the summer programs. He holds a bachelor's degree from Kearney State College and a doctorate from the University of Virginia. He has been associated with VMI since 1952, and has been chair of physical education since 1963. Tr. 292–94.

9. Major General Stanton R. Musser is Commandant of Cadets at Virginia Polytechnic Institute State University. He holds a bachelor's degree from Gettysburg College, and a master's degree from Central Michigan University. He served in the United States Air Force from 1958 to 1989, and accepted his current position upon retirement. Tr. 441–42.

10. Colonel Patrick Toffler is Director of the Office of Institutional Research (OIR) at the United States Military Academy ("West Point"). He graduated from West Point in 1968, and holds a master's degree from the Naval postgraduate school. The function of the OIR "Is to assess the degree to which [West Point] is successful in realizing its purpose, accomplishing its mission, achieving its outcome goals, and to assist the major decisionmakers in the conduct of their duty." The Office prepares reports on aspects of the West Point programs and Colonel Toffler comes into contact with all of the West Point constituencies. Tr. 478–481.

11. Colonel John Walter Ripley is the commanding officer of the Navy and Marine ROTC programs at VMI. He joined the Marine Corps directly after high school, and then received a fleet appointment to the Naval Academy, from which he graduated in 1962. He also holds a Master's Degree from American University. He has been an active-duty marine for over thirty years, and his service includes teaching appointments at Oregon State University and the Naval Academy prior to his current duty at VMI. Tr. 814–16.[1]

## II. *Public Higher Education in Virginia*

1. There are fifteen state-supported four-year colleges in the Commonwealth of Virginia:

Christopher Newport College
Clinch Valley College
College of William and Mary
George Mason University
James Madison University
Longwood College
Mary Washington College
Norfolk State University
Old Dominion University
Radford University
University of Virginia
Virginia Commonwealth University
Virginia Military Institute
Virginia Polytechnic Institute and State University
Virginia State University

Stipulation 126.

2. Historically, most of Virginia's public colleges were single-sex. Four colleges were originally limited by statute to women only. Mary Washington College, legislatively founded in 1908, became coeducational in 1970. Radford University, founded in 1910, became coeducational in 1972. Longwood College, founded as Farmville Female Seminary Association in 1839 and converted into a public institution in 1884, began a diversification program that led to the ad-

---

**1.** Testimony was also received from Commander Paul Galanti, a retired Navy Recruiting Officer, General James Morgan Dean of Faculty Emeritus of VMI, and Colonel Paul Maini, Executive Director of the VMI Alumni Association. This testimony did not contribute to the findings of fact.

mission of men in 1949.[2] James Madison University, founded in 1908, became coeducational in 1966. Stipulation 111; 1839 Va. Acts ch. 167; 1884 Va. Acts ch. 311.

3. On the men's side, the University of Virginia first admitted women only after its single-sex policy was attacked in court. *Kirstein v. Rector and Visitors of the University of Virginia,* 309 F.Supp. 184 (E.D.Va.1970). Virginia Tech was also originally male only.

4. All public colleges in Virginia, except for the Virginia Military Institute, are now coeducational. Thus, Virginia has one all-male public institution and no all-female colleges.

5. In the Fall of 1989, enrollment at the 15 public institutions included 72,819 men and 85,441 women. Stipulation 113. Of that number, 1312 (all men) are enrolled at VMI. VMI is substantially smaller than all of the colleges in the system except for Clinch Valley College, which has a very different mission.

6. Virginia offers a diverse array of educational opportunities through the decisions of the respective autonomous governing boards of Virginia's colleges and universities, public and private. The State Council of Higher Education's current plan for higher education states that "Virginia has always recognized that there are many kinds of excellence and has supported a diversity of missions among its institutions of higher education." Stipulation 108.

7. The Boards of Visitors of the various public colleges and universities in Virginia have traditionally enjoyed, and now enjoy, broad autonomy in the determination of such issues as the institution's mission, curriculum, the composition of its faculty, and the composition of its student body.

8. The 1990 Report of the Commission on the University of the 21st Century to the Governor and the General Assembly of Virginia notes that the hallmarks of Virginia's educational policy are "diversity and autonomy." Stipulation 105. It further states

The formal system of higher education in Virginia includes a great array of institutions: state-supported and independent, two-year and senior, research and highly specialized, traditionally black and single sex. Opportunities for fundamental change are open to all. But the sea change being felt in Virginia affects the entire system, and we think that Virginia should encourage creativity and discourage complacency by its method of governing higher education and by financial and other rewards.

Stipulation 106.

9. All expert witnesses agree that Virginia's system of higher education is diverse. Tr. 403 (Conrad); Riesman Dep. 89–91; Tr. 984 (Bunting). The diversity is a consequence of the relatively great autonomy given to the individual Boards of Visitors.

10. All Virginia statutes requiring individual institutions to admit only men or women have been repealed. Whether a university should be single-sex or coeducational is in every case decided by the Board of Visitors of the institution.

A. *VMI's Contribution to System–Wide Diversity*

1. VMI contributes to the diversity of Virginia's higher education in two related ways: (1) by providing an opportunity for single-sex education, and (2) through the unique VMI method of character development and leadership training.

2. Institutions of higher education that admit only males contribute greatly to diversity in higher education, and should be preserved. Diversity between different kinds of colleges as well as diverse student bodies at individual colleges is a positive

---

2. The stipulation does not state when Longwood first admitted men. The court in *Kirstein v. Rector and Visitors of University of Virginia,* 309 F.Supp. 184, 186 (E.D.Va.1970), listed Longwood as admitting women only.

aspect of the American, and the Virginia, higher education system. Riesman Dep. 22, 38–39.

3. Diversity between colleges, and the very high number of colleges, is one of the more striking differences between the American and British higher education systems. Tr. 984 (Bunting).

4. Aside from the unique qualities of the education VMI provides, the Commonwealth of Virginia awards some scholarships, the VMI State Cadetships, exclusively to VMI cadets. During 1990–91, 35 cadets were awarded $147,104. Defendants' response to plaintiff's third set of interrogatories at 16. A substantial number of private scholarships are also available only to VMI cadets. Women have no opportunity to compete for these scholarships.

5. Dr. Conrad concluded that the diversity of Virginia's higher education would not be diminished were VMI to admit women. He acknowledged, however, that single-sex education is a form of diversity. Tr. 371–74, 381–82.

B. *Role of Private Colleges*

1. There are five all-female private colleges in Virginia, Randolph–Macon Women's College, Mary Baldwin College, Sweet Briar College, Hollins College, and Southern Seminary College (which offers only a two year program). There is one private all-male college in Virginia, Hampden–Sidney College. VMI Exhibit 74A.

2. In the fall of 1989, 3850 women and 2256 men were enrolled in single-sex institutions of higher education in Virginia. All of the women, and 944 of the men, were enrolled in private institutions. Stip. 114.

3. Nationwide, 11,400 men attend single-sex · institutions. Of this number, 2,000–3,000 attend The Citadel, a public military college in Charleston, South Carolina; 1,300 attend VMI; and the remainder attend one of nine private institutions. Tr. 675, 724–25 (Richardson). There are about 56 single-sex schools for women, enrolling about 64,000 students. All but one of these are private, the exception being Douglass College in New Brunswick, New Jersey, which shares the campus of the much larger Rutgers University. The Mississippi College for Women remains primarily for women, but is required to admit men to its nursing program. *Hogan;* Tr. 676, 725 (Richardson).

4. From the above statistics, it would appear that the demand for public higher education in Virginia is slightly greater among women than among men. The demand for single sex education is substantially greater among women than among men, both in Virginia and nationwide. The presence of four all-female private schools in Virginia further indicates that the private sector is providing for that form of education to a much greater extent than it provides for all-male education.

5. No defense witness in this case offered to explain why Virginia provides the option of single-sex public education to men but not to women. This appears to be the consequence of individual decisions by each public college in Virginia to admit men. No evidence was submitted concerning the cost or practicality of creating a new, all-female public college, or of converting an existing college into an all-female institution.

C. *Public Influence on Private Colleges*

1. The Virginia Constitution permits the General Assembly to provide loans and other aid to students attending nonpublic institutions of higher education. Va.Const.Art. VIII, § 8; Stipulation 88. Virginia provides this aid through the Tuition Assistance Grant program. Va.Code § 23–38.11 *et seq.*

2. The report of the General Assembly Commission on Higher Education to the General Assembly of Virginia (Senate Document 19, 1974) states: (a) "Virginia needs the diversity inherent in a dual system of higher education." (b) "Higher education resources should be viewed as a whole— public and private." (c) "Even without state economic aid to private colleges, it is academic and economic waste to permit

unwarranted duplication." VMI Ex. 4, at 16.

3. Virginia relies on its independent institutions to offer students choices and meet the educational needs of people in the Commonwealth. Tr. 710 (Richardson). There is substantial voluntary cooperation between the public and private institutions on a variety of programs. VMI Ex. 55.

4. The Boards of Visitors of all of the Virginia public colleges are nominated by the Governor and are subject to confirmation by the State Senate. *See generally* Va.Code § 23. Private colleges face no legal restrictions in how they choose their directors.

5. Aside from the choice of particular college, a significant practical difference for a Virginia resident between attending a public and a private college is that, even with the Tuition Assistance Grant, the private education will be much more expensive.

### III. *The Unique VMI Educational Method*

1. The VMI method conforms generally to an adversative, or doubting, model of education. Physical rigor, mental stress, absolute equality of treatment, absence of privacy, minute regulation of behavior, and indoctrination in desirable values are the salient attributes of the VMI educational experience.

2. Some of the defendants initially argued that the VMI experience is available to women in substantially the same form at Virginia Polytechnic Institute State University (VPI). In answer to an early interrogatory, the Commonwealth stated, "There is no unique or special benefit, educational or otherwise, available at VMI which cannot also be obtained elsewhere in Virginia's higher education system." Response of Commonwealth to Second Set of Interrogatories, No. 4. Evidence at trial disproves this contention, which was never asserted by VMI itself. VMI and the military barracks at Virginia Polytechnic Institute are dramatically different institutions that offer dramatically different experiences.

3. The system of education at VMI is not offered elsewhere in the United States. Therefore, women have no opportunity anywhere to gain the benefits of this education. Tr. 139 (Bissell); 373 (Conrad).

4. VMI is sought out by some applicants for admission because it is known to be the most challenging military school in the United States, and because its alumni are exceptionally close to the school. Tr. 206 (Sandy).

### A. *The Adversative Model*

1. The VMI experience is predicated on the importance of creating doubt about previous beliefs and experiences in order to create a mindset conducive to the values VMI attempts to impart. VMI Ex. 58 (Richardson Report) at 22–23.

2. The adversative model has been used by military service and in the English public schools. Tr. 686 (Richardson).

3. The adversative model is not in widespread use in American higher education. Dr. Riesman's writings have criticized the permissiveness of American society and the lack of experiencing stress. Dr. Riesman believes that young people rarely experience difficult physical or intellectual demands. Few young people undergo a truly demanding academic program, and even fewer involve themselves in demanding extramural (i.e., outside of the curriculum) programs. While most colleges and universities make it *possible* for a student to get a good education, many such institutions make it easy for students merely to get by. Riesman Dep. 25–30.

4. Colonel N. Michael Bissell, the Commandant of Cadets at VMI, summarized the educational process at VMI as follows:

> I like to think VMI literally dissects the young student that comes in there, kind of pulls him apart, and through the stress, everything that goes on in that environment, would teach him to know everything about himself. He truly knows how far he can go with his anger,

he knows how much he can take under stress, he knows how much he can take when he is totally tired, he knows just exactly what he can do when he is physically exhausted, he fully understands himself and his limits and capabilities. Something I think is the mainstay of leadership. I think every VMI man that leaves there knows a great deal about his human capacity to do things under all kinds of duress and stress.

Tr. 803–04; *see also* Tr. 820–22 (Ripley).

5. All experts agreed that the individual systems comprising the VMI method for leadership and character development must be understood holistically. The individual systems are integrated into a unified experience through the barracks life. Altering any system will affect the educational experience as a whole. Tr. 690, 707, 758 (Richardson), 993 (Bunting), 780–81 (Bissell), 409 (Conrad).

B. *Rat line*

1. Entering students at VMI are called "rats" because the rat is "probably the lowest animal on earth." In general, the rats are treated miserably for the first seven months of college. Tr. 102 (Bissell).

2. Behavior that contributes to VMI objectives is rewarded; behavior that detracts is swiftly punished. Both punishment and reward are collective as well as individual. Being punished or rewarded for the sins or accomplishments of brother rats, as well as for one's own, builds a sense of class solidarity in addition to individual responsibility. The rat line is sufficiently rigorous and stressful that those who complete it feel both a sense of accomplishment and a bonding to their fellow sufferers and former tormentors. VMI Ex. 58 (Richardson Report) at 4; Tr. 347–48 (Conrad).

3. The rat line is an extreme form of the adversative model. It challenges all values and all forms of behavior in order to instill the values and behaviors for which VMI exists. Tr. 684–85 (Richardson).

4. Features of the rat line include indoctrination, egalitarian treatment, rituals (such as walking the rat line), minute regulation of individual behavior, frequent punishments, and use of privileges to support desired behaviors. Tr. 685 (Richardson).

5. The rat line is more dramatic and more stressful than Army boot camp or Army basic training. Tr. 785–86 (Bissell). It is comparable to Marine Corps boot camp in terms of both the physical rigor and mental stress of the experience. Tr. 818 (Ripley), 684 (Richardson).

6. At VMI almost every conceivable kind of behavior is anticipated and prescribed. There are thousands of regulations in place that govern cadet life. Tr. 395 (Conrad).

7. "Motivational activities" including stoop runs, fifteen-minute running and calisthenic events, rifle runs, training marches, and the like, are critical aspects of the rat line. Tr. 348–49 (Conrad).

8. The rat line is a very intense experience. Part of that experience is a tough physical training program that begins during the first 8–10 days that cadets spend on the VMI campus. The rigorous physical training is an important component of the rat system. Tr. 933 (Conrad).

9. Cadets who participate in NCAA sports during the regular school year are excused from the physical parts of rat training during the hours that they are practicing their sport. Tr. 112 (Bissell). Aside from that exception, all rats participate in all aspects of rat training.

10. All VMI cadets experience the rat line. The only time cadets can join the corps at VMI is in August, at the beginning of the school year. If cadets leave after joining, they are not replaced. Tr. 92–93 (Knapp).

C. *Class System*

1. The class system at VMI is a system of privileges and responsibilities aimed at developing the character and leadership of cadets. Each class has specific responsibilities. The first class, or seniors, are re-

sponsible for providing overall leadership, writing the standard operating procedures for the rat line for the following year, supervising the rat breakout, and for being a dyke to a rat. The third class, to cite another example, serves as disciplinarians to the rats. The class system is a very highly-developed system for cultivating leadership. Tr. 346–48 (Conrad).

2. After the rat line strips away cadets' old values and behaviors, the class system teaches and reinforces through peer pressure the values and behaviors that VMI exists to promote. This occurs within the barracks setting. The class system supplies the constant supervision of cadets, tutoring, and dispensation of privileges to reward desired values and behaviors. Tr. 687 (Richardson).

3. The degree and harshness of the regulations imposed through the class system is possible only through a peer system. Professionals working in the same environment could not duplicate the level of stresses without adverse consequences. Tr. 687–88 (Richardson).

### D. *Dyke System*

1. The dyke system is closely linked to the class system, and is the arrangement by which each rat is assigned a first classman as a mentor, called a "dyke." The dyke system provides some relief from the extreme stress of the rat line. Tr. 685 (Richardson).

2. The VMI system of education creates a sense of loyalty to one's brother rats. The dyke system contributes to this sense of loyalty. The dyke system also creates a cross-class bonding and provides a model for leadership and support. Riesman Dep. 43; Tr. 141–42 (Bissell).

### E. *Honor Code*

1. The VMI honor code holds that a cadet "does not lie, cheat, steal nor tolerate those who do." The sole penalty for violations of the VMI honor code is expulsion. The VMI honor code dominates all facets of institutional life. It is stringently enforced by an honor court comprised of cadets elected from the upper two classes. VMI Ex. 58 (Richardson Report) at 6.

### F. *Barracks*

1. Unlike most colleges, where the library is central and the dormitories are peripheral, the most important aspects of the VMI educational experience occur in the barracks. The barracks, therefore, are crucial to the VMI experience. Tr. 683–84 (Richardson). All cadets are required to live in the barracks for all four years at VMI. Tr. 761 (Richardson); VMI Ex. 11 at 11.

2. The barracks are the situs of the inspections, the rat-dyke relationship, administration of the class system, administration of the honor system, and much of the new cadet training, or rat line.

3. The barracks are designed to reduce all cadets to the lowest common denominator, from which the new cadet training system, class system, honor code, military system and academic system year-by-year builds the values, attitudes and behaviors expected from VMI graduates. In the process, upperclassmen exhibit unusual concern and serve as mentors for lower classmen. Producing a VMI graduate without the barracks experience would be equivalent to dressing someone up in the uniform of a Marine without first sending them to boot camp. VMI Ex. 58 (Richardson Report) at 3.

4. The report of the Reaffirmation Committee of the Commission on Colleges for the Southern Association of Colleges and Schools on March 16–19, 1986, observed that "[t]he barracks, VMI's student housing, is the center of campus life and reflects many of the educational objectives of the institution. There is no professional staff living in the barracks but cadets themselves provide support for life there." VMI Ex. 35, at 49.

5. The barracks' configuration is a training aid, and the barracks is a total training environment in which the class system functions. Each class is assigned a

floor in the barracks, which has four floors. There is a total lack of privacy. Everyone knows what everyone else is doing. The closest a cadet can come to privacy at VMI is a study table in the library because there is literally no place in the barracks that physically affords privacy. The open windows on the doors in the barracks are significant because they enable the officer in charge to walk around and check in each room at night and see every cadet without anything being hidden. This spartan living and humbleness is an aspect of the egalitarian ethic at VMI. Tr. 794–98 (Bissell).

6. The average occupancy rate of cadet rooms at VMI, according to VMI's 1985 Self–Study, was 3.7 cadets per room. It is uncommon, if not unique, for a college or university to have a dormitory occupancy rate exceeding three persons per room. Tr. 435–36 (Brewer).

7. The barracks are stark and unattractive. The windows and the doors ensure that cadets are never free from scrutiny. There is constant intermingling of cadets as a result of the close and intimate quarters and the number of cadets assigned to a room. Ventilation is poor. Furniture is unappealing. A principal object of these conditions is to induce stress. Tr. 683 (Richardson), 350 (Conrad).

8. There are no locks on the doors of cadet rooms in barracks, no windows in the barracks doors, no window shades or curtains. Barracks rooms open onto stoops. The stoops are open corridors at each level and provide access to the gang bathrooms. On the fourth floor a cadet cannot go to the bathroom or go to take a shower without being observed by everyone in that quadrangle on all levels. This places cadets under constant scrutiny and permits minute regulation of behavior, especially for the fourth classmen who reside on the top floor. VMI Ex. 58 (Richardson Report) at 3; Tr. 683–84 (Richardson).

9. The egalitarian treatment associated with barracks life is as important as the elements of stress and lack of privacy. In barracks, a cadet is totally removed from his social background. Tr. 992–93 (Bunting).

10. No other institution, including the service academies, places such emphasis on barracks or dormitory life. The lifestyle system at VMI is unique. Tr. 394 (Conrad).

G. *Military System*

1. The military regulations, etiquette, and drill, primarily furnish a rationale for the rigorous activities that are features of the other VMI systems, including the comprehensive regulation of behavior and the wearing of uniforms. The military regulations confine the choices and developmental tasks confronted by students to those considered essential to the achievement of VMI's mission. They are not directly connected to the ROTC program. VMI Ex. 58 (Richardson Report) at 6; Tr. 690 (Richardson).

2. Each cadet who matriculates at VMI must select one of the four ROTC programs during the first week of school. All cadets must be affiliated with one of the four ROTC programs, for all four years at VMI. Tr. 216–18 (Williams); Stip. 33.

3. Nothing about the Air Force ROTC program at VMI, as described in the VMI promotional booklet, is unique to VMI (other than the absence of women). Tr. 234 (Williams); U.S. Ex. 95.

4. The ROTC programs at VMI operate independently of the barracks system and its various components such as the rat line, the class system and the dyke system. Tr. 819–20 (Ripley).

H. *Educational System*

1. The academic program (aside from physical education) at VMI is not unique. VMI offers undergraduate courses leading to Bachelor of Arts and Bachelor of Science degrees, in liberal arts, science, and engineering disciplines. VMI Ex. 11.

2. All of the programs offered at VMI, and virtually all of the courses, are available to women at VPI. Because VMI is a much smaller school, it offers many fewer courses. VMI Ex. 8, 11.

3. The academic standards for admission to VMI are somewhat lower than those for VPI. VMI incoming students have slightly lower median SAT scores and slightly lower median class rank. VMI Ex. 62M.

### I. *Evening and Summer Sessions*

1. The VMI summer session is not conducted as a military college. Stip. 62. During the summer session the VMI Corps of Cadets does not exist or function as an organized body. In the VMI summer session, the class system, the rat system, and the dyke system are not in operation. Stips. 62–64.

2. During the summer session, summer students are not subject to military discipline and training, and are not required to wear uniforms or participate in military formations or drills. Stip. 65.

3. During the summer session, no enrolled student, whether or not a VMI cadet, is required to live in the barracks, but has the option to reside in the barracks or in housing in the surrounding area. During the academic year, all enrolled students are required to live in the barracks. Stip. 67.

4. During the summer session, females, both students and non-students, may not live or visit in the barracks. Stip. 68.

5. During the summer session, there is no physical training and no leadership training. Stip. 71.

6. All students enrolled in the summer session are required to abide by the honor code; however, the Student Honor Court, which adjudicates honor cases during the regular session, is not in operation. Stip. 72.

7. During summer session, outsiders (i.e., non-VMI people), live in barracks. For example, participants in sports camps and in the College Orientation Workshop program for black male high school students live in the barracks. Tr. 308 (King), 794 (Bissell), Stip. 69.

8. VMI summer session differs in many ways from the VMI regular session. It has a different purpose, offers different programs, is administered separately, has different admissions criteria and does not offer a VMI degree or military training. *Id.* No. 13, Tr. 792–94 (Bissell).

9. VMI maintains a very small evening college program. Cadets are not permitted to attend the evening school, nor do evening school students participate in any cadet activities. The evening school has no military component, and cadets and evening school students interact in no respect. No evening school students live in the barracks. Tr. 294 (King); 791–92 (Bissell).

### IV. *VMI's Mission*

1. The mission of VMI is concisely and authoritatively captured in the final report of the Mission Study Committee of the VMI Board of Visitors (issued May 16, 1986), which states:

> It is the mission of the Virginia Military Institute to produce educated and honorable men, prepared for the varied work of civil life, imbued with love of learning, confident in the functions and attitudes of leadership, possessing a high sense of public service, advocates of the American democracy and free enterprise system, and ready as citizen-soldiers to defend their country in time of national peril.
>
> To accomplish this result, the Virginia Military Institute shall provide to qualified young men undergraduate education of highest quality—embracing engineering, science, and the arts—conducted in, and facilitated by, the unique VMI system of military discipline.

VMI Ex. 40.

2. VMI's mission is to produce educated and honorable men who are suited for leadership in civilian life and who can provide military leadership when necessary. Tr. 680–81 (Richardson), 41 (Knapp).

3. The concept of citizen-soldier has been associated with VMI for nearly a century and a half. VMI's mission is to train disciplined leaders for civilian and/or military life. Tr. 341 (Conrad).

4. Dr. Conrad discerned five basic goals that VMI seeks to promote in fulfilling its

mission of preparing leaders: (1) education, both general and specialized; (2) military training; (3) mental and physical discipline; (4) character development; and (5) leadership training. Tr. 343–44.

5. Dr. Conrad testified:

[VMI] is an institution with a very, very powerful ethos. What is that ethos? It's a commitment to the citizen-soldier, a commitment in which the values of how one goes about preparing a citizen-soldier have taken shape, been nourished over time and I reflected it in the development of ... eight, at once independent and at the same time, highly interdependent. systems. This is an institution that has a very powerful ethos, a compelling institutional culture in which it is in essence a kind of total culture.... People who know higher education know VMI, and now I certainly, in a much deeper sense understand the powerfulness of that ethos, [which] engenders such great strength and loyalty.... Here was a distinctive culture, with a rich ethos, and in many ways a quite extraordinary tradition of service to the state and nation.

Tr. 354–55.

6. It is important for a college to be able to articulate its mission, for more than public relations purposes. An institution must know and be able to tell others what it stands for and why it exists. Riesman Dep. 32–34; Tr. 388 (Conrad).

7. VMI has done a very good job of conveying its goals and its values, and has been successful in accomplishing those goals; specifically, instilling physical and mental discipline, character, and a kind of moral code. Tr. 389 (Conrad).

A. *Character Development*

1. Dr. Richard C. Richardson, Jr., an expert in higher education, single gender schools and leadership, testified that VMI is extremely unusual, even unique, in that it makes the development of character its primary purpose. VMI is primarily involved in moral development and leadership preparation. Tr. 691, 695, 765.

2. Dr. David Riesman, a leading sociologist and authority on higher education, has, in his writings, expressed dismay over the increasingly egotistical, narcissistic people coming out of our institutions of higher education. Dr. Riesman believes that the personal value of self-discipline is an important concept for colleges and universities to teach because the popular culture supports hedonism and early gratification. As a result, young people do not develop as they should. Riesman Dep. 25.

3. As a consequence of completing the rigorous tasks, succeeding, and actually graduating from VMI, VMI cadets have a sense of having overcome almost impossible physical and psychological odds. They have been put through great physical pressures and hazards, and just to have made it yields a feeling of tremendous accomplishment. Riesman Dep. 49–50.

4. VMI alumni overwhelmingly perceive that their VMI educational experience contributed to their obtaining personal goals of leadership, responsibility, self-confidence, ability to get along with others, becoming a more complete person, independence, self-reliance, adaptability, and developing a strong sense of honor and integrity. VMI Ex. 62H–62I.

5. Cadets attend VMI for these reasons: (1) because of the rigor of the experience, which represents a challenge and which he believes will test him to the ultimate; (2) because he is not satisfied with his work habits or self-discipline, and wants to become a different person; and/or (3) because he knows someone who recommends it, or because his father attended VMI. Tr. 681 (Richardson).

6. Once they arrive at VMI, cadets appreciate various attributes of the Institute: (1) the openness and the fact that they hear very directly and very candidly about their shortcomings as well as the things they do well; (2) the intensity of the experience, and the extent that it challenges them to be better; (3) the relationships they develop; and (4) the absence of distinctions between cadets, and the egalitarian environment. Tr. 681–82 (Richardson).

7. VMI's emphasis on character formation has been consistent since its founding. VMI was founded on the site of an arsenal in Lexington, Virginia, by act of the Legislature in 1839. It was patterned on the United States Military Academy at West Point and the Ecole Polytechnique, an engineering school in Paris founded during the French Revolution. VMI Ex. 54, p. 7; 68; 61; 77A; 77M; Stips. 11–13.

8. Within a few years of the founding of VMI, most of the systems of character-building and leadership training that characterize VMI today were in place, with the exception of the dyke system, which the Corps evolved later as a corrective to a rat line that had become overly harsh. VMI Ex. 61 at 397–98; 68.

9. Throughout VMI's history, its military system—the use of military regulations, etiquette and drill—has served the function of teaching self-discipline. It is intrinsic to the VMI theory of education, but it is a means to an end, not an end in itself. The role of VMI is not primarily to develop career military men for the U.S. armed services. Stips. 26, 45, 131, 135, 138, 141; Tr. 342 (Conrad), 775 (Richardson); VMI Ex. 77A, 77D, 77F, 77N, 77O, 77S, 77T.

B. *Civilian Leadership*

1. VMI takes students that are average from an academic perspective, and through the character development program, graduates people who have more than average commitment and motivation as well as character. Tr. 695 (Richardson).

C. *Military Leadership*

1. Since 1842, at least 13,954 VMI alumni have served in the armed forces during wartime. Of these, at least 10,233 were commissioned officers and 128 were flag officers. VMI Ex. 76.

2. Military training is one of the basic goals that VMI seeks to promote in fulfilling its mission of preparing leaders. Tr. 343–44 (Conrad).

3. The VMI experience promotes the development of qualities important to effective combat leadership: Self control, self discipline, and the belief that you must subordinate your own personal desires and well-being to the good of the whole unit. The aspects of the VMI experience that are most significant in developing these qualities are: (1) the rat line; (2) the dyke system; and (3) the class system. Tr. 820–22 (Ripley).

4. The outcome of the VMI educational system is graduates who are prepared to be citizen-soldiers. Because of the VMI experience, VMI alumni are prepared to find the military benign in comparison with much of what they experienced at VMI. They are prepared for difficulty, and are prepared to help others in difficulty. Riesman Dep. 45–46.

D. *VMI Mission Study*

1. The General Assembly of Virginia has delegated to the VMI Board of Visitors the making of VMI's admission policy pursuant to Va.Code Annot. § 23–104, with reservation to the General Assembly pursuant to Va.Code § 23–92.

2. The VMI Board has seventeen members, including the Adjutant General of Virginia who serves *ex officio.* At least four members of the Board cannot be VMI alumni. Va.Code § 23–93. The members are persons of achievement and learning from varied backgrounds, occupations and professions. Tr. 944–47, 966–67 (Spivey).

3. The VMI Board of Visitors established the Mission Study Committee in October 1983. The Committee was established to coincide with a self-study then being conducted by the Institute. The Committee was also charged with examining the legality and wisdom of VMI's single-sex policy in light of *Mississippi University for Women v. Hogan.* It was charged with researching the effect of integration of women into the VMI Corps of Cadets. The Board of Visitors directed the Committee to examine the Institute's mission, and the relationship between its ad-

mission policy and achievement of that mission. Tr. 948–49 (Spivey).

4. The Mission Study Committee was comprised of seven persons, three of whom who were VMI alumni. The Committee included a female, Dr. Virginia Lester, then President of Mary Baldwin College. Tr. 949–50 (Spivey).

5. In preparation for their deliberations, the Mission Study Committee read materials on education and on women in the military. They made site visits to single-sex and newly coeducational institutions.

6. On the visit to West Point, the Committee met with the Special Assistant to the Superintendent for Policy and Planning, the Director of Admissions, representatives of the Commandant, Director of the Center for Leadership, the Special Assistant to the Commandant for Honor, the Dean, the West Point historian and other selected officers and cadets, as well as with the Superintendent. The discussion focused on the issue of the integration of women at West Point.

7. West Point provided generally favorable information concerning coeducation: (1) male and female cadet attrition occurs for the same reasons; (2) resentment of female cadets by male cadets has faded and "[a]cceptance is gained on the basis of individual achievement"; (3) VMI graduates will "probably be considered disadvantaged in the coed Army" because they do not come from a coed environment; (4) the introduction of women did not significantly change West Point; (5) women perform and compete as well as men in cadet basic training, cadet field training, and cadet advanced training, which are summer training programs; (6) training for men and women is comparable, but not identical, taking into account gender-based differences; (7) female cadets take the same physical education courses as men, except that they take self defense instead of boxing and wrestling; (8) the cost of educating a cadet did not rise significantly with the admission of women; (9) there had been "no changes in the curriculum, procedures, or facilities of the academic program because of the admission of women"; (10) female cadets have had no trouble with the West Point honor system. "Women are underrepresented in honor offenses," and "[t]he system is applied equally to men and women"; and (11) gender integration has been successful, and "women's accomplishments have excelled all anticipated levels." U.S. Ex. 68.

8. In its visit to the Naval Academy, the Committee met with the Superintendent, the Dean of Admissions, the Academic Dean, the Acting Commandant, the Professional Development Officer and other selected officers and midshipmen of both sexes. Once again, the Committee explored a whole range of issues regarding the integration of women into the Corps—issues such as gender discrimination, discipline, academic performance, fraternization, integration into the plebe system and honor system, recruiting requirements and modifications of the physical regimen. The committee was told that: (1) "[t]here have been no changes in the Naval Academy academic program because of the introduction of women"; (2) the plebe indoctrination system of the first year "imparts stress and pressure for the entire first year," and "[w]omen are totally integrated into the entering class except for the obstacle course and some of the physical aptitude exercises"; (3) "[t]he success rate of midshipmen at the Naval Academy depends on a combination of academic rating, conduct rating, and performance rating," and "[m]ale and female midshipmen do equally well;" (4) although the Naval Academy modified its physical aptitude entrance requirements for women, male physical standards were not changed; (5) women are a minority at the Naval Academy, and some deal with this effectively and some have a hard time; and (6) "[t]he relationship between male and female midshipmen becomes more harmonious each year. Total acceptance has taken a long time; some midshipmen are more ready to accept women than others." *Id.* The Acting Commandant stated that "[n]othing has changed at the Academy except some physical training

requirements and some facilities. Women have performed very well at the The Naval Academy and women have met same academic standards as men." *Id.* p. 6.

9. The Committee also visited Washington & Lee University for an interview with Dr. John D. Wilson, president of that institution. There, the Committee learned that: (1) the decision to admit women to that institution was "based on the need to maintain and improve academic quality...."; (2) "the honor system based on a 'closed society of shared values' would not be threatened...."; and that (3) due to its changed admissions policy, better qualified students are expected to be attracted to the institution and that as a result the quality of life there will improve. U.S. Ex. 92C. Significantly, Dr. Wilson made the following observation:

> A severe life of military discipline is at the core of the VMI experience. There is pride in mutual suffering which binds the classes together. If women were admitted, the system would have to be modified. The entire system would not be destroyed, but modifications would be inescapable.

*Id.*

10. Mr. Casteen participated in the introduction of coeducation at the University of Virginia, and visited the federal service academies to obtain information on how those institutions were preparing to integrate women. He characterized the introduction of coeducation at the University of Virginia as a "very positive experience." U.S. Ex. 69. He stated that, contrary to expectations, female students at the University of Virginia tend to enroll in the strongest departments and superior programs including engineering and architecture. *Id.* He pointed out that "all male colleges which have admitted women have been strengthen[ed] by women...." *Id.* at 2. He emphasized the role of an institution's leadership in the admission of women: "[I]t happened [at the University of Virginia] because top leadership made it

happen." *Id.* at 3. Most tellingly, he stated:

> [T]he success rates of women at the USMA have been extraordinary. He stated that it was his observation that women will conform and excel in any environment. He added that their success will depend on the application of the internal discipline system and whether or not it is applied equally to all cadets. He pointed out that at UVA, women were not assigned to separate dormitories but housed in coed dorms.

\* \* \* \* \* \*

> VMI represents the idea that every citizen is a soldier on demand, and this should include women.... Thus, he stated, the Institute has a chance to provide leadership in this regard by training women for military service.

*Id.* at 2, 3.

11. The Mission Study Committee issued its final report in May 1986. It "found no information that would warrant the change of VMI status as a single-sex college." The Report provided very little indication of how this conclusion was reached. VMI Ex. 40. The one and one-half pages in the committee's final report devoted to analyzing the information it obtained primarily focuses on anticipated difficulties in attracting females to VMI. *Id.* p. 2–3. One paragraph of this analysis epitomizes the current position of the VMI defendants in this litigation:

> The presence of women at the Institute would not alter the program academically; however, there would have to be some adjustments made in the military and physical demands made upon male cadets. Because many of these demands contribute to the ethos of which the Virginia Military Institute is proud and which, it is firmly believed, contributes to the unity of the Corps, there is doubt that the same spirit could be maintained at the same level in the same way if women were introduced into the Corps.

*Id.* p. 2.

12. The Report of the Reaffirmation Committee of the Commission on Colleges

for the Southern Association of Colleges and Schools on Virginia Military Institute (March 16–19, 1986) provides:

> The visiting committee found that although the statement of purpose had not been changed since the last self-study, the Board of Visitors assisted by staff of the Institute is reviewing VMI's mission. This review has been thorough and has included visits to other institutions with review of their mission and purpose statements. The committee commends the Board and VMI administration for recognizing the need for periodic review of the Institute's purpose and for engaging in activities necessary to modify that statement of that purpose as may be indicated.
>
> As the self-study states, the Institute's Mission Statement has served it well over the years. As an institution approaching its 150th birthday, the Mission Statement reflects the constant purpose of VMI to provide a distinctive and superior academic program conducted in and facilitated by a rigorous system of military discipline. Graduates of the Institute come to know this mission in a very personal way by their participation in VMI's unique system. The graduates as products of their system have by their achievements brought distinction to the Institute....

VMI Ex. 35 at 5, 12.

13. The Mission Study Committee of the Board of Visitors of the Virginia Military Institute found that the admission of women into the VMI Corps of Cadets would alter the mission of VMI. It considered the reasons that other institutions had changed from single-sex to coeducational status. It found the motivation to be mixed and further found that none of the motivating factors of the other institutions applied to the VMI mission. VMI Ex. 40 at 2.

14. This evidence amply supports a finding that VMI's mission was established early in the life of the institution, and has been continued only after reasoned and careful analysis by the Board of Visitors.

## V. *Mission of Military Unit at VPI*

1. The purpose of the VPI Corps of Cadets "is to produce men and women of the Virginia Polytechnic Institute and State University who are honorable, educated and trained for military service to their country and prepared to be effective leaders in the varied work of military and civil life." Stip. 152; Tr. 460 (Musser); U.S. Ex. 57.

2. VPI has approximately 18,000 students, roughly 40% of whom are women. Its Corps of Cadets, a residential ROTC unit, now contains 394 cadets, including 67 women. Tr. 443 (Musser).

3. All unmarried VPI students enrolled in the ROTC program must live in the residential hall. Married cadets are not required to live in the hall. Tr. 472 (Musser).

4. Females first entered the VPI Corps of Cadets in the fall of 1973 and were assigned to a separate unit within the Corps. In February 1979, "the female cadets were integrated into the eight regular line units.... Concurrent with the integration of the female cadets, a female version of the male uniform was authorized, thereby bringing about a greater uniformity in the attire of Corps members." U.S. Ex. 60.

5. There are no differences on the basis of gender in admission requirements to the Corps, in participation in the Corps, or in physical accommodations for cadets. Tr. 469–70 (Musser). Female cadets at VPI have, at one time or another, held every leadership position in the Corps, including regimental commander, which is the most senior position. Stip. 156; Tr. 447–48.

6. The typical weekly schedule for members of the Corps is the same for men and for women. Tr. 450; U.S. Ex. 51, Reg. 3.1. Each morning one battalion, consisting of 250 cadets, forms up and marches to breakfast. After breakfast, cadets start their academic day which normally runs until 4:00 or 5:00 p.m. At 5:00 p.m., there is a retreat ceremony, and cadets are required to be in their rooms at 7:00 p.m.,

with lights out at 11:00 p.m.. Tr. 448–49. Cadets must be in uniform all day. Tr. 450 (Musser).

7. Each new cadet goes through new cadet training, also called "cadre week," which takes place about eight days prior to the entry of all other freshman into Virginia Tech. Tr. 450–51; U.S. Ex. 77. Cadre week is a "tough week of learning," which involves classes, marching and drill lessons, lectures on the honor code, and athletics. It starts early each morning and ends about 11:00 p.m. Tr. 451. Without any distinctions, men and women participate in the same activities during cadre week. Tr. 452 (Musser).

8. The new cadet system, which is mandatory for all entering cadets, runs until sometime between Thanksgiving and Christmas, when the new cadets are recognized as a class by the upperclassmen. The new cadet system includes daily calisthenics, exercises, runs, and other athletics. Women are required to participate in the same calisthenics, exercises, and runs as the men, although some allowances are made for gender differences, particularly with regard to upper body strength. Both men and women participate in all parades and drills. Tr. 454–56 (Musser). In sum:

> All VPI Cadets must successfully master in their first year a basic training program. The basic training program is a rigorous challenge, physically and mentally. It is intended to place all cadets on equal footing; teach fundamentals of military courtesy and discipline; impress upon cadets military customs, ideals, and esprit of the Corps and instill respect for authority, self-reliance, and develop leadership potential. VPI believes that completion of the training program also serves as a binding element between and among cadets.

Stip. 155.

9. The new cadet system requires memorizing "new cadet knowledge," which is information about the Corps that cadets must be able to recite to upperclassmen on demand. If a cadet does not know certain information when he or she is asked, that cadet can be required to do push-ups or, in some cases, marching tours. A tour is a one-hour march around the barracks with five-minute breaks every twenty minutes. Both men and women can be subjected to push-ups or tours. Tr. 457–59 (Musser); U.S. Ex. 16.

10. The Corps' honor code states: "I will not lie, cheat or steal nor tolerate those who do." Tr. 461–62; U.S. Ex. 57. The Corps' disciplinary system is modeled after the Uniform Code of Military Justice, and it applies equally to men and women. Tr. 462.

11. The VPI Corps is organized along Army lines, but a system of class privileges also exists. These entitle upperclassmen to greater freedoms as they progress. Tr. 463–64 (Musser); U.S. Ex. 57.

12. Both male and female cadets are subject to scheduled and unscheduled room inspections. Failure to pass inspection results in demerits. No distinctions are made on the basis of gender. There are no restrictions regarding who can visit the cadet dormitories, but visitors must be escorted. Tr. 466–68 (Musser); U.S. Ex. 57.

13. The Corps has a dyke system similar to VMI's, the primary difference being that VPI uses juniors and VMI uses seniors. Both males and females participate in this mentor system. Tr. 468–69 (Musser).

14. Two floors in each building house other students who are not cadets. These students share the same facilities throughout the buildings with the cadets. Tr. 465–66 (Musser).

15. In a section of one of the residence halls, where the regimental cadet staff is housed, the men and women share the same bathroom, although not at the same time. There currently are four men and two women on the regimental staff. Tr. 427, 473 (Musser).

16. VPI cadets eat in the same mess hall as other students, although there is no section set aside for the Corps. Other students can also eat in that section. By

contrast, cadets at VMI eat together in one large facility that accommodates all of them. VPI cadets normally eat both breakfast and dinner together. Tr. 428, 457 (Musser).

17. The institutional environment of the VPI Cadet Corps differs greatly from that of VMI. Because only 2–3% of VPI students live in the Cadet Corps barracks, the military experience is more diffuse. Tr. 336 (Conrad).

18. Because VMI is a small place with 1,300 students, and VPI is a "multiversity" with 18,000 students in graduate as well as undergraduate courses, it offers its students a different educational experience. Tr. 359 (Conrad).

19. The most dramatic differences between VMI and VPI concern the operation of the respective Corps. VMI emphasizes uniformity, hierarchy, and the adversative method. VPI recognizes individual differences and is more informal. Tr. 361 (Conrad). VPI uses "positive motivation" rather than the "negative motivation" used at VMI. Tr. 474 (Musser).

20. The differences between VPI and VMI's educational experiences outweigh the similarities, independent of gender. Tr. 363–64 (Conrad). Thus, the programs have similar goals but very different methods. This leads to two conclusions: (1) Women are denied a unique educational opportunity that is available only at VMI; and (2) The success of women at VPI sheds little light on whether women would be successful at VMI.

## VI. *Contrasting Mission of Federal Service Academies*

1. The mission of the federal service academies is to prepare cadets for career service in the armed forces. This is very different from the mission of VMI, which is directed at preparation for both military and civilian life. Only about 15% of VMI cadets enter career military service. Tr. 410–11 (Conrad); Riesman Dep. 98–99.

2. VMI has gone to considerable lengths to assure the public that is not simply a military college. Tr. 342–43 (Conrad).

## VII. *Differences Between Men and Women*

### A. *Gender–Based Physiological Differences*

1. When Congress made the decision to admit women at West Point, they instructed the Military Academy, in effect, to change whatever standards needed to be changed in order to accommodate physiological differences between men and women. West Point has identified more than 120 physiological differences that exist between men and women, and tries to accommodate those differences to the minimal extent necessary. Tr. 510–11, 513 (Toffler).

2. The physiological differences between males and females identified by West Point's Office of Institutional Research are very real differences, *not stereotypes*. Tr. 519 (Toffler).

3. Most men perform far better than most women in activities which require explosive power, e.g., sprinting, basketball throw, medicine ball put, and jumping events. Even when size is held constant, females are, on the average, only 80% as strong as males. VMI Ex. 119 at 26.

4. The speed of movement in women is, on the average, slower than in men. VMI Ex. 119 at 27.

5. Aerobic capacity relates to the ability to consume and utilize oxygen. The number of liters of oxygen one can effectively metabolize on a minute-by-minute basis indicates the fitness level of a person. Using the applicant pool of individuals for induction into the U.S. Army, Dr. Paul Davis, VMI's expert in human physiology, determined that for high fitness level requirements, such as those for military firefighters, infantrymen, and most of the combat arms, 5% or fewer median college-age females would possess the requisite fitness level to perform those jobs, as compared to 85% of median college-age males. Approximately 15% of median college-age females can perform activities requiring medium

aerobic capacities. Approximately 95% of median college-age males can perform activities requiring medium aerobic capacity. VMI Ex. 59A; Tr. 886–88.

6. High maximal lifting capacity refers to the ability to lift 50 kilograms to a height of 132 centimeters of distance, which corresponds to the tail board of a military truck. Approximately 7% of median college-age females possess high maximal lifting capacity, as compared with approximately 80% of males. Approximately 50% of median college-age females can engage in activities requiring a medium maximal lifting capacity, while 100% of median college-age males can engage in such activities. VMI Ex. 59B; Tr. 888–90 (Davis).

7. On the average, college-age females possess approximately 10% more body fat than college-age males. Body fat imposes a burden on some kinds of physical performance. VMI Ex. 59C; Tr. 89–92 (Davis).

8. On the average, college-age females perform a two-mile run approximately three minutes slower than the median for college-age males. VMI Ex. 59D; Tr. 893–95 (Davis).

9. The median college-age female is not capable of performing push-ups equivalent to that of the median college-age male. Of the females tested, none was able to come close to meeting the push-up requirement of the VMI physical fitness test. The maximum number of push-ups by a female was 18, compared with a minimum requirement of 45 push-ups on the VMI fitness test. VMI Ex. 59E; Tr. 894–95 (Davis).

10. There is no data available to compare the performance of males and females with respect to pull-ups because only the Marine Corps has a requirement for pull-ups. Dr. Davis testified that the female is at a distinct disadvantage as far as the performance of that activity, and the difference between performance of the genders in this activity is 500–1000 percent. The minimum requirement for pull-ups for the VMI physical test is five. Tr. 896.

11. Dr. Davis examined aggregate data related to injuries incurred among a group of 2,400 persons participating in Army basic training. Army basic training has a duration of eight weeks, while the VMI rat line has a duration of about seven months. The data show that physical fitness and avoidance of injury are correlated; as one's fitness level improves, the incidence of injury goes down. However, regardless of fitness level, differences exist between males and females across the board in that females suffer injuries more frequently than males. Tr. 907–13.

12. Median college-age females tend to sustain injury up to eight times the rate of median college-age males when engaged in the same or similar physical activities. VMI Ex. 59G to 59O; Tr. 909–13 (Davis).

13. By the most conservative estimate, the lost time that females would suffer due to injuries—based on the Army model—is 480% greater than the lost time experienced by males in Army basic training. Tr. 913 (Davis). Despite the higher injury rate for women (and despite the additional disability leaves associated with pregnancy), a 1978 Navy study found that male soldiers are, on the average, more likely to be absent from duty a particular time, principally because men are much more likely to be suspended for disciplinary related reasons. U.S. Ex. 18.

14. Comparison of the United States Military Academy classes of 1989 and 1981 male and female cadets on the Army physical fitness tests, USMA indoor obstacle course test, and the USMA physical ability test, shows the following:

(a) Seven of eight physical tests show half (50th percentile) of the women performed below the bottom five percent of the men. The single exception is the Army physical fitness sit-up test, which was almost identical for the two groups.

(b) Three-quarters (75th percentile) of the women performed below the bottom five percent of the men in the indoor obstacle course and physical ability test push-up, standing long

jump, modified basketball throw, and 300–yard shuttle run test.

(c) The 75th percentile of women for the class of 1989 Army physical fitness test push-up performance was equal to the 8th percentile performance for the men; and the 75th percentile women for the class of 1981 performance was equal to the 13th percentile performance for the men.

(d) For the Army physical fitness test two-mile run, the 75th percentile women for the classes of 1989 and 1981 performance was equal to the 22nd and 13th percentile men, respectively.

VMI Ex. 157.

15. West Point has concluded that males outperformed the females on all of the common physical aptitude tests, and that competition between the two groups on the basis of raw scores would severely limit the admission opportunities for women. VMI Ex. 166, at 3.

B. *Gender–Based Developmental Differences*

1. According to Dr. Richardson, the "nature of an experience that is growth-producing for a majority of women, according to the literature, is one that is supportive, is one that emphasizes positive motivation. I'm not saying that some women don't do well under adversative model, undoubtedly there are some who do, but you [do not] design educational experiences around the exception. You have to design them around the rule, and I think you would find that the doubting model . . . the adversative model . . . would have to be gradually adapt[ed] so that it incorporated more of the positive motivation, positive reenforcement." Tr. 702.

2. A substantial body of contemporary scholarship and research supports the proposition that, although males and females have significant areas of developmental overlap, they also have differing developmental needs that are deep-seated. VMI Ex.

73; Tr. 376–77 (Conrad), 686–87, 692–93 (Richardson); Riesman Dep. 13, 57–67.

3. The literature regarding developmental differences between males and females and the advantages of single-sex education contained in VMI Ex. 73 reflects the work of only a small portion of the academics who, in recent years, have suggested that there are important differences between men and women in learning and developmental needs. Tr. 376–77 (Conrad).

4. Given these developmental differences females and males characteristically learn differently. Males tend to need an atmosphere of adversativeness or ritual combat in which the teacher is a disciplinarian and a worthy competitor. Females tend to thrive in a cooperative atmosphere in which the teacher is emotionally connected with the students. Riesman Dep. 63–65, 95, 106–07; Tr. 684–87, 692–93 (Richardson); VMI Ex. 73B, D, E, and G.

5. Commenting on the scholarly literature and empirical evidence that single-sex education is desirable in light of gender-based developmental differences, the government's expert, Dr. Conrad, described the gender differences identified by researches as "tendencies." He emphasized that the attributes of males and females *in individual cases* may diverge from these average tendencies. In other words, there are exceptions to the general rule. Tr. 377, 380 (Conrad).

6. Colonel Toffler of West Point has observed the psychological and sociological differences between males and females during his study of the integration process at West Point. He attributes the slightly higher attrition rates for females at West Point, in part, to gender-based sociological differences. West Point attempts to accommodate the distinctive psychological and sociological needs of women. The psychological and sociological differences between men and women are real differences, not stereotypes. Tr. 513–16, 519, 545–50 (Toffler).

7. During his trial testimony, Dr. Conrad not only acknowledged the broad empirical support for the value of single-sex

education, and also described himself as a "believer in single-sex education." Dr. Conrad commented that single-sex education has great virtues for many people under many conditions. Tr. 373. In response to a question from the Court, Dr. Conrad stated that his advocacy of coeducation at VMI was based on a philosophical preference for openness in public institutions, and not on considerations of educational quality. Tr. 382.

8. Single-sex educational opportunities are valuable for both males and females. For many men, a single-sex college is optimal. At an all-male college, adolescent males benefit from being able to focus exclusively on the work at hand, without the intrusion of any sexual tension. Riesman Dep. 38–39; Tr. 986–87 (Bunting).

9. Single-sex schools for adolescent men are effective where discipline is maintained and sound role models are present. Riesman Dep. 95, 107; Tr. 693 (Richardson).

10. According to the research of Alexander Astin, based on data from the early 1970's, single-sex colleges show a pattern of effects on both sexes that is almost uniformly positive. Students of both sexes become more academically involved, interact with faculty frequently, show larger increases in intellectual self-esteem and are more satisfied with practically all aspects of college experience (the sole exception is social life compared with their counterparts in coeducational institutions). Men's colleges substantially increase the likelihood that men will carry out career plans in law, business and college teaching; they also have a substantial positive effect on starting salaries in business. Women's colleges increase the chances that women will obtain positions of leadership, complete the baccalaureate degree, and aspire to higher degrees. Alexander Astin, *Four Critical Years,* (1977); admitted as VMI Ex. 73I.[3]

11. Astin's research indicates that students are able to invest more energy in academic pursuits and in interaction with faculty in single-sex colleges because they have few opportunities to dissipate energy in courtship activities. In all likelihood, heterosexual activity is more circumscribed—confined to weekends, for example—in single-sex colleges. VMI Ex. 73I, K, L, M, P, Q, and R; Riesman Dep. 54, 109; Tr. 986 (Bunting).

12. Research also shows that students attending single-sex colleges are more likely to take the risk of choosing a career normally associated with the other sex than are students in coeducational colleges. Marvin Bressler and Peter Wendell, "The Sex Composition of Selective Colleges and Gender Differences in Career Aspirations," 51 *Journal of Higher Education* 650 (1980); admitted as VMI Ex. 73J.

13. Astin has written that, with respect to single-sex colleges as compared to coeducational colleges, the greater interaction with faculty and greater satisfaction with the collegiate experience, despite the constraints on social life, may result from the greater sense of identification and communal feeling when both students and faculty are predominantly of the same sex. VMI Ex. 73I; *see also* VMI Ex. 73K, L, M, and Q.

14. Single-gender schools facilitate their students' focusing on education by screening out distractions. Thus, the single-gender nature of VMI is directly related to its goal of focusing cadets' energies on development of leadership values. Tr. 694, 729–31 (Richardson); Riesman Dep. 54, 62–63, 94.

### VIII. *Anticipated Effects of Coeducation on VMI*

1. A coeducational VMI would offer neither males nor females the VMI education that now exists. The changes would substantially affect the method now used to educate citizen-soldiers. Tr. 804 (Bissell), Dep. 101 (Riesman), 676–77 (Richardson).

---

**3.** Astin's research was cited favorably by Justice Powell in his dissenting opinion in *Mississippi University for Women v. Hogan,* 458 U.S. 718, 738–39, 102 S.Ct. 3331, 3343, 73 L.Ed.2d 1090 (1982). The volume was properly admitted as a trial exhibit in this case.

2. Colleges that face a major change in clientele typically change their methods in three stages:

The first stage involves removal of the barriers that barred a particular group or class of students from admission.

The second stage involves efforts to help the new class of students succeed, through such measures as recruitment efforts and support services.

The third and final stage involves recognition that the institution cannot attract sufficient numbers of the new class of students to make their experience beneficial without modifying the institutional experience. As a result, at this third stage, the institutional experience, even its mission, is altered in order to conform to the developmental needs of the changed clientele.

Tr. 696–98 (Richardson).

3. The admission of women at VMI would represent a "dramatic clientele change." Tr. 368 (Conrad).

## A. *Demand for VMI Education Among Women*

1. Trial testimony included a great deal of speculation, but very little evidence, on demand for a VMI education among women. This uncertainty is due to a lack of recruitment among women.

2. VMI engages in extensive recruiting activities, including visiting high schools to "spread the word about the valuable education" it offers. Tr. 42 (Knapp).

3. Alumni also perform substantial recruitment activities. Their efforts to date have been aimed exclusively at male applicants. Tr. 172 (Sandy).

4. Typically, VMI representatives set up tables at high schools and offer materials regarding VMI. Women who stop by are told that VMI accepts only male applicants. VMI does not keep any records of either the names or the number of women who stop by. Tr. 44 (Knapp).

5. In the past, VMI responded to inquiries from females by sending letters explaining VMI's male-only admissions policy. In the last two years, Lt. Col. Sandy has been instructed not to respond in any fashion to inquiries from females. Women who send written inquiries to VMI now receive no response at all. Tr. 193–94.

6. Between 1988 and 1990, VMI received inquiries, test scores, or other requests for information from 347 women. Because VMI did not respond to them, the seriousness of these inquiries cannot be determined. U.S. Ex. 104, 105.

## B. *VMI's Special Recruitment of Blacks*

1. VMI has distributed a recruitment booklet aimed specifically at black students. U.S. Ex. 79. VMI also attends specific programs for minority students, purchases names from the college board of black students with SAT scores sufficient for admission to VMI, and targets specific high schools to recruit black students. VMI targets black students because it likes "to have students of different backgrounds, racial backgrounds, ethnic backgrounds in the school," and because recruiting black students is one of the objectives set forth by the State Council on Higher Education. Tr. 173–74 (Sandy).

2. Some special steps are taken to address the needs of black students. VMI's 1990–91 budget includes $22,000 for expenditures on "Retention of Black Cadets." U.S. Ex. 3 at 28.

VMI's self-study reported:

A program for the retention and effective performance of black freshmen was initiated in the fall of 1983. The primary objective was to insure the students' success in the basic disciplines of mathematics and English. The program is thus designed primarily to offer the student crucial academic support. Experience gained during the first year of the Cadet Retention Program indicates that black freshmen also need and certainly will appreciate, outside a formal academic context, opportunities to discuss their shared experiences as new, minority members of a dominantly white and tradition-oriented student body. This appar-

ent need and the similar one of other black cadets is also addressed.... Social-cultural support and black student morale within a dominantly white institution are important secondary concerns of the program.

U.S. Ex. 24, at 57–61.

3. VMI offers a three-week college orientation workshop to black (male) high school students. The program is intended to get students interested in going to college in general, and in attending VMI in particular. The students live in the barracks, attend classes, and go through demanding physical training "to show them what it might be like at VMI." Tr. 308, 312–13 (King).

4. The Promaji Club, one of about 70 extracurricular clubs at VMI, is organized as a club following the interests of black cadets. Like all clubs at VMI, it is open to all students. U.S. Ex. 79 at 8; Tr. 49 (Knapp).

5. VMI is currently about 7% black. The special recruitment program for blacks has had little, if any, effect on VMI's method of accomplishing its mission. Black cadets particularly appreciate the egalitarianism of VMI. Tr. 46–48 (Knapp); Riesman Dep. 79, 81–83.

C. *Recruitment of Women at Other Military Institutions*

1. Currently, approximately 250 women attend residential ROTC military programs, which are based at Texas A & M University, Norwich University, North Georgia College and VPI. VMI Ex. 62L.

2. Four hundred sixty-one women are enrolled at West Point, 423 at the Naval Academy, 532 at the Air Force Academy, and 131 at the Coast Guard Academy. These institutions feature a military curriculum. However, they differ from VMI both in their mission and in that they do not have admission fees and, in fact, pay student salaries while they are enrolled.

3. Dr. Richardson testified that he believed that successful recruitment of wom-

en would likely yield VMI a cadet corps of approximately 10% women, or 130 women. This number is apparently based on the experience at West Point, which offers a very different kind of program and has much higher academic standards. Dr. Richardson conceded that the number is highly speculative. Tr. 720–21.

4. Expert estimates of the number of women necessary to provide a good educational environment for women at a formerly all-male school range from 10% to 40%. The 40% figure appears in an October 1990 Report of the Committee on Women's Issues of the United States Naval Academy Board of Visitors, which has a significantly lower number of women at this time. VMI Ex. 67 at 11. The 10% figure is based on the positive West Point experience, and was accepted by VMI's Mission Study Committee. Tr. 486–87 (Toffler); Stip. 7; VMI Ex. 40 at 2.

5. Of the 1,946 women who applied for admission to West Point in the class of 1992, only 155 were admitted. The female applicants not admitted did not meet the qualifications for admission. The capacity for the class was filled, and in the opinion of the Admissions Committee, filled with the best-qualified applicants, and the high-competition objectives and class objectives had been satisfied. Tr. 484–85 (Toffler).

6. Currently, many men who are denied admission to the federal service academies meet the admissions standards of VMI. However, VMI has found that very few rejected applicants from West Point choose to attend VMI. Tr. 204–05 (Sandy).

7. The federal military academies limit the admission of female students by placing a cap on the number of such students who can be admitted in any one year. The cap is equivalent to the percentage of women presently on active duty in the branch of the armed forces represented by the particular academy. Approximately 10% of the cadets at West Point are women. Stip. 196; Tr. 482 (Toffler).

8. Based on the fragmentary evidence, including VMI's experience with recruitment of blacks, it appears that VMI would

be able to achieve at least 10% female enrollment while maintaining its ROTC requirements. This would be a sufficient "critical mass" to provide the female cadets with a positive educational experience.

### D. *Need for Privacy*

1. If VMI were to admit women, there would be changes in the barracks culture. Adaptations would have to be made in order to provide for individual privacy, for the sake of the men as well as for the sake of the women. Tr. 367 (Conrad); Riesman Dep. 61–62.

2. The introduction of privacy required by admission of women at VMI would contradict the principle that everyone is constantly subject to scrutiny by everyone else. The honor code would cease to be the absolute boundary between VMI and the outside world because it would become possible for cadets to take action at VMI without being observed. Tr. 701.

### E. *Physical Education*

1. If women were admitted to VMI, it would be necessary to change certain physical training program courses and to set different standards. Unlike the federal service academies, VMI currently does not use "ability groups" in its physical programs or activities. VMI imposes the same physical requirements on a 150–pound cadet as on a 190–pound cadet. Tr. 788–89 (Bissell).

2. Changes in the physical education program would be necessary if women were admitted at VMI. For example, boxing and wrestling requirements would have to be changed, as would certain aspects of the rat training programs. Either these would have to be abandoned, or there would have to be accommodations that would result in a dual track for women. Tr. 35, 66–67 (Knapp), 896–98 (Davis), 788–89 (Bissell).

3. Currently, 98% of VMI cadets pass the physical fitness test before graduation. Assuming an applicant pool similar to that at the military academies, approximately 15% of females in the applicant pool could successfully meet the requirements of the current VMI physical fitness test.

4. The goal of physical testing is to design a single program or criteria in such a way as to insure that it represents a reasonable challenge to the greatest number of individuals. Because of the physiological differences between male and female cadets, it would not be possible to design a program that would be challenging to both sexes if it were a coeducational program. A program that would challenge but not discourage female cadets would pose an insufficient challenge for the vast majority of males. Tr. 898–900 (Davis).

5. Female cadets would not be able to perform the tasks in the VMI rat training program at a level comparable to that of male cadets. Because of physiological differences, the majority of females would not be able to complete the tasks associated with the rat line as currently constructed, at the same levels as males. Tr. 906 (Davis).

6. If VMI were coeducational and females were subjected to the same physical demands as male cadets, females would suffer on the order of 300% more injuries than males. Tr. 902–07 (Davis).

7. The intensity and aggressiveness of the current program would be reduced if women were admitted and requirements for all cadets were adjusted, and rat training would have to undergo extensive changes. The program's benefit to the morale of male participants would be adversely affected. Tr. 918–22, 930–32 (Davis).

### F. *Armed Forces Experience*

1. The Marine Corps trains males and females in separate units at boot camp. The Marine Corps tried using a gender-integrated platoon in officer basic training, but found the experience inferior. One concern was that the program became insufficiently rigorous for males. Tr. 818–19 (Ripley).

2. The Marine Corps also trains men and women in separate summer camps as

part of the Marine Corps ROTC program. Tr. 819 (Ripley).

3. The U.S. Army segregates men and women in basic training at the platoon level. They are integrated at the company level. The Army looked at a variety of combinations and determined that segregation was appropriate for basic soldier training. Tr. 616 (Toffler), 786–788 (Bissell).

## G. *West Point Experience*

1. When Congress passed a statute requiring the federal service academies to admit females, it directed the academies to make the adjustments necessary to accommodate the physiological differences between men and women. Tr. 510–11 (Toffler).

2. Since admitting women, West Point has modified basic training to break it into groups according to ability. Tr. 601–03 (Toffler).

3. Since the admission of women, West Point has adopted the concept of comparable or equivalent training. The physical activities assigned to women and to men differ, but have comparable training benefit for the people who go through them. An example would be boxing for males versus self-defense or judo for females. Another example is pull-ups for males versus the flexed arm hang for females. Tr. 609–10 (Toffler).

4. Prior to the admission of women, recondo training (i.e., various strenuous activities, including a forced march with a pack) was part of cadet field training. Recondo training is no longer conducted during field training. Tr. 606–07 (Toffler).

5. Prior to the admission of women, running exercises were conducted wearing combat boots. Subsequently, a change was made so that running exercises were conducted in running shoes. Prior to the change, women were suffering a significantly higher injury rate in cadet basic training. Tr. 608–09 (Toffler).

6. Since women have been admitted at West Point, physical training no longer includes running events in which cadets carry weapons. Tr. 604–06 (Toffler).

7. Since the admission of women, the indoor obstacle course that cadets run as part of their training has been modified to remove certain events and replace them with others. The events that were removed were events that required upper body strength. One of the reasons these events were eliminated was concern that women would be psychologically discouraged by them. Tr. 607–608 (Toffler).

8. If women were admitted to VMI, there would be changes in physical education requirements to reflect physiological differences. Coeducation would also affect physical training, which is incorporated into the rat system. Tr. 366 (Conrad).

9. At VMI, there are intense physical demands placed on cadets. Given the biological differences between men and women, changes would have to be made to adapt the physical demands to the capabilities of women. VMI would have to make the changes analogous to those that have been made at the service academies, and might find it necessary to introduce the concept of comparable training used at West Point. Tr. 366–67 (Conrad).

## H. *Impact of Gender Classes*

1. The VMI experience is based on absolute equality, which is achieved through treating everyone in exactly the same way. VMI Ex. 58 (Richardson Report) at 22.

2. There are approximately 66 approved clubs at VMI. Consistent with the egalitarian ethic, VMI prohibits the exclusion of any cadet from membership in any club. VMI also has a policy that prohibits fraternities and secret societies. The significance of those policies lies in "the egalitarian aspect that every cadet must be exactly the same, treated alike and attend or go to any club or facilities that may be available to them, but a total egalitarian approach." Tr. 790–91 (Bissell).

3. Given the actual physiological, psychological, and sociological differences between males and females, it would be impossible to treat everyone fairly by continu-

ing to treat them the same if women were admitted to VMI. Equal treatment would necessarily give way to fair treatment, thus undermining egalitarianism. Tr. 698, 701–02 (Richardson).

4. If women were admitted to VMI, class differences between male and females would be introduced. These differences would appear in physical training. Tr. 367–68 (Conrad).

5. If women were admitted to VMI and housed in a separate barracks, they would miss the VMI experience. It would provide women with an undesirable experience in which their second-class citizenship would be emphasized. Some military institutions that have tried housing women in separate quarters, and found that it simply does not work. In order to achieve results satisfactory to them, they must be integrated rather than isolated from the experience. Tr. 706 (Richardson).

6. The admission of women at VMI would undermine the ethic of egalitarianism by creating jealousies and concerns about whether people were being treated equitably. Cross-sex relationships, dating, and aspirations are attributes of a coeducational system, and are inconsistent with the complete equality that is a central attribute of the VMI system. Tr. 731 (Richardson); Riesman Dep. 60–61.

7. Since the admission of female cadets at West Point, studies have consistently shown that cadets of both sexes perceive treatment as unequal. This perception gives rise to jealousy and resentment among cadets. Tr. 518–19 (Toffler); VMI Ex. 91, 92, 103.

8. Survey data compiled by West Point indicates that some cadets do not accept the concept of comparable or equivalent training because they resent the fact that they have to do something at one level while another person does not have to meet the same standard. Tr. 610–11 (Toffler).

I. *Impact of Cross–Sex Relationships*

1. Dr. Richardson testified: "[VMI] does what it does because it has an isolated cloistered environment that focuses on a very narrow range of purposes.... [It] uses a developmental process that is attuned to male developmental needs during the period of adolescence. [The admission of women would] inject ... into that environment the necessity of coping with cross sex relationships, ... especially at a very vulnerable period of development [when] people are in fact trying out the relationships that will characterize their future life in society.... [The VMI system] considers only how you develop a particular gender and it is focused in every part on ... optimizing that development." Tr. 729–30.

2. Admission of women at VMI would produce cross-sex relationships among cadets that would significantly alter the character-building and leadership-development aspects of the VMI experience. Tr. 700–01 (Richardson).

3. Cross-sex interaction and relationships would inject a new and distracting developmental aspect into an environment at VMI that currently excludes that aspect and focuses narrowly upon other aspects of development. Tr. 700–01, 729–31 (Richardson).

4. Equal treatment is much more likely to be obtained in a single-sex setting. Cross-sex relationships, dating, and aspirations are attributes of a coeducational system, and are inconsistent with the complete equality that is a central attribute of the VMI system. Riesman Dep. 60–61.

J. *West Point Experience*

1. The VMI Mission Study Committee determined that integration of women at West Point was made possible by the Academy's move away from its adversative new cadet system to a much more developmental style of training and emphasis on positive leadership. The change coincided with Army-wide changes in leadership style. U.S. Ex. 68.

2. The first women were admitted to West Point in the summer of 1976 and graduated with the class of 1980. The admission of women, at that point, resulted from legislation signed by the President in

1975. Prior to that time, West Point's position on the admission of women was one of opposition. Tr. 482–83 (Toffler).

3. At West Point, dating between cadets is generally permitted except that fourth class cadets must date within their class and all cadets are precluded from dating within the chain of command. West Point has conducted no study to determine the impact of dating on the discipline of the Corps of Cadets. Tr. 623–25 (Toffler); VMI Ex. 146 at 2–3.

4. The doors at West Point on cadet rooms are solid and equipped with locks. Cadets are permitted to close their doors unless there are only two cadets in the room at a particular time and the cadets are of the opposite sex. Tr. 627–28 (Toffler).

5. West Point regulations require that a person desiring entry to a cadet's room must knock and await acknowledgement before entering. VMI Ex. 146 at 2–4.

6. At West Point and Virginia Tech, unlike VMI, there are doors on the toilet partitions separating the toilets. Tr. 432–33 (Brewer).

7. West Point is not concerned with eliminating all visible financial distinctions among cadets. Tr. 626–27 (Toffler).

8. West Point abolished the new cadet system, or fourth class system, in 1990. Under the current program, fourth class cadets are assigned a faculty member as mentor. After cadet basic training, which is the 6–8 weeks before the start of the academic year for new cadets, West Point has reduced the amount of memorizing and reciting information about West Point's history and traditions by new cadets. West Point has also acted to eliminate practices such as upperclassmen yelling at and disciplining new cadets, requiring them to run personal errands, bracing (sitting with chin tucked in the cavity of one's neck) during meals, and requiring physical activities such as push-ups. Tr. 616–20 (Toffler).

9. With the admission of women, West Point modified regulations relating to uniforms, hair length and jewelry, Tr. 625–26 (Toffler).

10. Under West Point's regulations, if a subordinate believes that a senior is operating improperly, it is within their place to discuss that with the senior. Tr. 595–96 (Toffler).

11. Hazing of new cadets, including demeaning or insulting activity, and requiring excessive physical performance, are examples of improper senior-subordinate interaction, which are not permitted at West Point. Though such interactions were technically improper prior to 1990, they were common practices and were part of the new cadet system. Since 1990, the prohibition on these activities has been enforced. Tr. 619–23 (Toffler).

12. The abolition in 1990 of new cadet, or fourth class, system at West Point, and the substitution of a new system, were designed to eliminate the application of stress upon fourth class cadets by more senior cadets. The new system uses positive motivation, instead of stress, as a means of leadership development. The new leadership development is designed to function for all four years of the educational experience, rather than being focused upon the first year.

K. *Educational and Military Systems*

1. Experts are in general agreement that coeducation would have little or no effect on ROTC program at VMI. If anything, the VMI ROTC experience would become a better training program from the perspective of the armed forces, because it would provide training in dealing with a mixed-gender army. U.S.Ex. 68.

2. Coeducation would have some effect on the educational programs at VMI. For example, women might suggest different reading in literature courses. This effect would not be likely to change either the quality or the mission of VMI. Tr. 365–66 (Conrad).

L. *ROTC Programs*

1. To enroll in the Air Force ROTC program, a cadet must pass the Air Force

officer qualifying test, a 5½ hour test that resembles the SAT. This is the same test administered to every Air Force officer candidate throughout the United States. The test can be retaken up to three times, with six-month intervals between each. About 15% of the cadets fail the test the first time. Tr. 218–20 (Williams).

2. Cadets must also pass a physical, which is set by the Department of Defense and administered to all applicants for commissioning in the armed forces. Tr. 222.

3. The academic requirements for VMI's Air Force ROTC program are the same as those at any other undergraduate institution in the United States. Tr. 223.

4. The Air Force ROTC program also includes weekly leadership labs, which is partially waived at VMI because VMI "picks up the responsibilities for training our cadets on the techniques of marching, drill, those types of things." Leadership lab is required by the Air Force of all ROTC cadets. Tr. 223–24 (Williams).

5. The Air Force ROTC physical fitness test given to VMI cadets is the same test that is administered by any other undergraduate institution of higher education which offers ROTC to all students in that program. If a cadet cannot pass the physical fitness test by the end of his sophomore year, he cannot attend the summer field training. If he does not attend the field training, he cannot become an officer. The Air Force sets the requirements for the physical fitness test. With the exception of pull-ups, women and men perform the same events in this test; women do the flex arm hang rather than pull-ups. Scoring of the events is different for men and women. Tr. 225–29 (Williams).

6. The summer field training program is a "four-week summer encampment," and he likened it to "a modified rat line." Women attend the same camps, are subject to the same "modified rat line," participate in the leadership reaction course work, and participate in the other physical training he described. Approximately 25 to 30 female ROTC students would participate in the same training as men at each summer camp at each base. Thus, VMI cadets attend and take the summer camp training side by side with females. Tr. 229–32 (Williams).

7. Students in the University of Virginia's Army ROTC program are required to take certain ROTC classes, including a leadership laboratory once a week, as well as a two-day field training exercise each semester. They are required to participate in a physical training program of their own choosing. Each semester they must take and satisfactorily complete the Army physical training test. Tr. 247–48 (Randall).

8. All ROTC students must take and pass the Army physical fitness examination several times, including prior to summer training camp. Tr. 249–50, 253. Male and female students take the ROTC academic courses, and do the same exercises for the physical fitness exam. Tr. 254. Standards for the physical fitness examination differ by age and sex. Tr. 253 (Randall).

9. Cadets must attend the summer training camp between their junior and senior year. The six-week evaluation and training program is "very strenuous." Both male and female ROTC students participate in summer camp training, both are subject to the same physical and psychological stress, and both successfully complete the program. Tr. 257–62 (Randall).

10. Seventy-four students participate in the Army ROTC program at the University of Virginia (UVA), 11 of whom are females. Tr. 253–54 (Randall).

11. The Air Force ROTC requirements at UVA are substantially the same as those at VMI. UVA Air Force ROTC students participate in the summer training camp as VMI cadets, and female students successfully complete the program. Tr. 273, 275. Of 90 cadets participating in the UVA Air Force ROTC program, 19 are females. Tr. 273 (Stickell).

M. *Physical Facilities*

1. Defendants stipulated that "the VMI Barracks can be altered from a physical

point of view to accommodate females." Tr. 414 (statement of counsel).

2. At West Point, male and female cadets occupy identical rooms side by side in the barracks. There are no designations as to which rooms are occupied by males or females, and separate gang shower rooms and gang toilet rooms are used by males and females. There are no differences between the facilities for men and women. Tr. 421–23 (Brewer).

3. With the exception of the fact that cadets at VMI roll up their mattresses during the day, the cadet rooms at VMI are similar to the cadet rooms at West Point. Tr. 424 (Brewer).

4. At VPI, there are two cadet residence halls. Male and female cadets occupy the same floors and, in some instances, they have rooms adjacent to one another. Separate but identical gang shower and toilet facilities are used by male and female cadets. One gang shower and toilet room was used by both male and female cadets, at different times. When women use this facility, a sign entitled "women" is hung on the door. Tr. 425–27 (Brewer).

5. There are no differences in the physical accommodations for VPI cadets on the basis of gender. All cadet rooms are identical. Tr. 426, 469 (Brewer).